**UNITED STATES of America**

v.

**Vince GIOVENGO, Samuel Paladino.**

**Appeal of Samuel PALADINO.**

**No. 80–1793.**

United States Court of Appeals, Third Circuit.

Argued Nov. 6, 1980.

Decided Dec. 31, 1980.

Rehearing and Rehearing In Banc Denied Jan. 26, 1981.

Harold Gondelman (argued), Gondelman, Baxter, Mansmann & McVerry, Pittsburgh, Pa., for appellant.

Robert Cindrich, U. S. Atty., W. D. Pa., Pittsburgh, Pa., William C. Bryson, Janis H. Kockritz (argued), Attys., Dept. of Justice, Washington, D. C., for appellee.

Before ADAMS and SLOVITER, Circuit Judges, and BROTMAN, District Judge.[*]

## OPINION OF THE COURT

ADAMS, Circuit Judge.

In this case, Samuel Paladino appeals from convictions for transgressing the federal wire fraud statute, 18 U.S.C. § 1343 (1976), and for conspiring to commit wire fraud in violation of 18 U.S.C. § 371 (1976).

The facts, as they appear from the evidence viewed in the light most favorable to the government,[1] indicate that Paladino and Vincent Giovengo devised and executed a scheme to defraud Trans World Airlines (TWA) of money paid by passengers who purchased one-way airline tickets with cash. TWA employed both Paladino and Giovengo as customer service agents at the Greater Pittsburgh Airport. Generally, Giovengo sold tickets, while Paladino assisted passengers boarding the TWA aircraft.

When a passenger approaches a TWA agent at an airport with a request to purchase a ticket, the agent enters ticket information into a TWA computer terminal. The terminal transfers a wire signal to interstate telephone circuits leased by TWA from the American Telephone and Telegraph Company (AT&T), and the signals are transmitted to the main TWA computer located in Kansas City, Missouri. The Kansas City computer then transmits a return signal over the telephone lines to the originating airport terminal, and the requested ticket is imprinted by a printing machine. The ticket itself contains several pages: a credit card charge form which is forwarded to a credit company if the passenger charges the ticket, but which is discarded if the sale is for cash; an auditor's coupon retained by TWA; several flight coupons; and the passenger's receipt.

Under the arrangement in question, when a customer purchased a one-way ticket with cash, Giovengo would present the customer with the flight coupon required in order to board the aircraft. Instead of handing the customer his passenger receipt, however, Giovengo would present the customer with the credit charge form which should have been discarded inasmuch as the transaction was for cash. Giovengo would keep the auditor's coupon, all extra flight coupons, and the passenger receipt. The passenger would then proceed to the boarding gate, where Paladino would collect the flight coupon and issue the traveller a boarding pass. After the flight departed, Giovengo and Paladino would reinsert the flight coupon into the pages of the ticket, thereby reassembling all the pages of the original ticket except for the charge card forms. The entire ticket would then be marked void and sent to TWA's accounting department. Since the ticket had been voided, the accounting office did not look for a corresponding cash amount. Giovengo and Paladino would divide between themselves the money that passengers had paid for the tickets.

This fraudulent scheme came under scrutiny when a TWA cashier noticed that some of the voided tickets did not contain all their original flight coupons. After the two men were indicted, Giovengo pleaded guilty to conspiracy to commit wire fraud and testified as a government witness at Paladino's trial. A jury convicted Paladino on six counts of wire fraud and one count of conspiracy to commit wire fraud.

---

[*] Honorable Stanley S. Brotman, United States District Judge for the District of New Jersey.

[1] See Burks v. United States, 437 U.S. 1, 17, 98 S.Ct. 2141, 2150, 57 L.Ed.2d 1 (1978); Glasser v. United States, 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942).

The federal wire fraud statute, 18 U.S.C. § 1343 (1976), provides:

> Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, scheme or artifice, shall be fined not more than $1,000 or imprisoned not more than five years, or both.

Paladino maintains that § 1343 does not apply to all interstate wire communications, but only to those regulated by the Federal Communications Commission (FCC). He goes on to contend that since TWA is not a common carrier regulated by the FCC, transmissions over the interstate lines it leases are not within the jurisdiction of FCC regulation, and fraudulent use of those wires cannot constitute a violation of § 1343.

■■■ We find no merit in this argument. Nothing in the language of § 1343 suggests that its scope is limited to fraud committed by use of interstate wires subject to FCC regulation.[2] Instead, the terms of the statute indicate that it applies to anyone who commits fraud "by means of wire, radio, or television communication in interstate or foreign commerce." The legislative history of § 1343 also fails to confirm Paladino's theory. Paladino correctly points out that § 1343 was originally enacted as part of the 1952 Amendments to the Communications Act of 1934, c. 652 tit. I, 48 Stat. 1064, *codified* at 47 U.S.C. § 151 et seq. Although the 1952 Amendments dealt largely with the regulatory powers of the FCC, it does not follow, as Paladino asserts, that § 1343 must be construed as restricted to communications subject to regulation by the Commission. On the contrary, the legislative history suggests that Congress

wished to prohibit as much wire fraud as it could constitutionally make unlawful,[3] limited only by a desire to avoid "Federal intrusion upon the police power of the States." *See* H.R.Rep.No. 388, 82d Cong., 1st Sess. 3, U.S.Code Cong. & Admin.News, pp. —— (1951). It has been suggested, for example, that irrespective of any constitutional limitations that might stem from the interstate commerce clause, prosecution of a localized fraud is best left to local enforcement authorities. *See id.* at 8–9 (letter from Justin Miller). Concern for the integrity of local law enforcement is inapposite to the case before us, however. Paladino and Giovengo executed their fraudulent scheme at an international airport from which flights originate to all parts of the world; the tickets with which they tampered had provided travellers with transportation to places outside of Pennsylvania; the victim of their fraud was TWA, a large corporation doing business throughout the United States and the rest of the world; and during the course of their fraudulent activity, the two men made use of a communications network linking the TWA computer in Kansas City to terminals in Pittsburgh. These considerations persuade us that the scheme we are asked to assess does not fall within the category of localized fraud which the legislative history suggests that Congress intended to exclude from the scope of § 1343.

Even if federal regulation were a predicate for application of § 1343, the fraudulent scheme engaged in by Paladino and Giovengo would not for that reason fall outside the scope of the statute. The lines over which the two men transmitted messages from Pittsburgh to Kansas City were owned and maintained by AT&T, and were merely leased by TWA. AT&T is, of course, a common carrier of messages by wire, as defined by 47 U.S.C. § 153(h) (1976), and its interstate telephone lines are subject to the jurisdiction of the FCC and

---

2. Not all transmissions over interstate wires are regulated by the FCC; 47 U.S.C. § 152(b) (1976) identifies several forms of interstate communication over which the Commission may not assert jurisdiction.

3. Paladino does not claim that Congress lacks constitutional authority to forbid the activity in which he engaged.

within the regulatory provisions of the Federal Communications Act, *see Comtronics, Inc. v. Puerto Rico Telephone Co.*, 553 F.2d 701, 704 (1st Cir. 1974).[4]

In order to resolve the present appeal, we must next ascertain whether Paladino and Giovengo used interstate wires "for the purpose of executing" their scheme to defraud. The language of § 1343, forbidding only those communications transmitted "for the purpose of executing" a fraudulent scheme, parallels that of the mail fraud statute, 18 U.S.C. § 1341 (1976).[5] In light of the similarity of the language employed in the two statutes, this Court has observed that "they are in this regard *in pari materia* and are, therefore, to be given similar construction.... Accordingly, the cases construing the mail fraud statute are applicable to the wire fraud statute as well." *United States v. Tarnopol*, 561 F.2d 466, 475 (3d Cir. 1977).

The Supreme Court has considered the scope of the mail fraud (and by implication, the wire fraud) statute on several occasions. In *Kann v. United States*, 323 U.S. 88, 95, 65 S.Ct. 148, 151, 89 L.Ed. 88 (1944), the Court stated:

> The federal mail fraud statute does not purport to reach all frauds, but only those limited instances in which the use of the mail is a part of the execution of the fraud, leaving all other cases to be dealt with by appropriate state law.

*See also Pereira v. United States*, 347 U.S. 1, 8, 74 S.Ct. 358, 362, 98 L.Ed. 435 (1954) (a

federal violation exists if the use of the mails is "incident to an essential part of the scheme"). The Supreme Court has most recently applied these principles in *United States v. Maze*, 414 U.S. 395, 94 S.Ct. 645, 38 L.Ed.2d 603 (1974). Maze had stolen his roommate's BankAmericard, and had used it to obtain food and lodging at motels in California, Florida, and Louisiana. Each of these establishments mailed to the bank that had issued the credit card invoices representing goods and services furnished to the defendant. The mail fraud count of the indictment charged that the defendant knew that each merchant would cause the sales slips for the purchases to be delivered by mail to the bank. The indictment also charged that the delay in this mailing would enable the defendant to continue to purchase goods with the stolen credit card.

The Court reversed defendant's conviction for mail fraud, finding that the mailings were not "sufficiently closely related to respondent's scheme to bring his conduct within the statute." The Court noted that "[r]espondent's scheme reached fruition when he checked out of the motel, and there is no indication that the success of his scheme depended in any way on which of his victims ultimately bore the loss. Indeed, from his point of view, he probably would have preferred to have the invoices misplaced by various motel personnel and never mailed at all." 414 U.S. at 402, 94 S.Ct. at 649.

---

4. While TWA is not itself a "common carrier" for purposes of FCC jurisdiction, it does not follow that TWA is therefore incapable of violating the wire fraud act through its use of interstate communications. TWA might be compared to a user of the telephone who, although he is not himself subject to regulation by the FCC, may nonetheless violate § 1343 by attempting to obtain money through false representations transmitted by means of interstate telephone. *See United States v. Cowart*, 595 F.2d 1023, 1031 n.10 (5th Cir. 1979); *United States v. Wise*, 553 F.2d 1173, 1174 (8th Cir. 1977); *United States v. Freeman*, 524 F.2d 337, 339 (7th Cir. 1975), *cert. denied*, 424 U.S. 920, 96 S.Ct. 1126, 47 L.Ed.2d 327 (1976).

5. 18 U.S.C. § 1341 (1976) provides:

> Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, ... for the purpose of executing such scheme or artifice or attempting so to do, places in any post office or authorized depository for mail matter, any matter or thing whatever to be sent or delivered by the Postal Service, or takes or receives therefrom, any such matter or thing, or knowingly causes to be delivered by mail according to the direction thereon, or at the place at which it is directed to be delivered by the person to whom it is addressed, any such matter or thing, shall be fined not more than $1,000 or imprisoned not more than five years, or both.

Use of interstate wires was integral to Paladino's scheme in a way that use of the mails was not essential for Maze. Authorization for the printing of TWA airline tickets comes from Kansas City, and communications between the airport terminal at which a ticket request is made and the Kansas City computer which coordinates sales are carried over interstate wires. Without access to interstate transmissions, Paladino and Giovengo would have had no tickets to sell to TWA customers. Unlike Maze, Paladino would not have preferred to have had the interstate communications stop, for in that event he would have had no tickets to present to the customers. The use of interstate communications was thus "incident to an essential part of the scheme." *Pereira v. United States*, 347 U.S. at 8, 74 S.Ct. at 362.

Our decision in *United States v. Tarnopol*, 561 F.2d 466 (3d Cir. 1977), also suggests that the use of the wires in the present case was related to the fraudulent scheme in a sufficiently close manner so as to bring the conduct of Paladino and Giovengo within the ambit of the statute. Defendants in *Tarnopol* were officers of a corporation engaged in selling and marketing phonographic recordings manufactured by a different firm. After the manufacturer had produced recordings, it shipped them directly to customers in accordance with directions received from defendants. The manufacturer then mailed to the defendants' corporation a "packing slip" or shipping document. Defendants intercepted these slips and prevented them from being recorded on ledgers maintained by their company. In this way they improperly diminished the payment of royalties to artists, song writers and publishers to whom

the company owed compensation based on sales.

The mailings relied upon by the government in support of its charges of mail fraud were the packing slips mailed by the manufacturer to defendants' corporation. We held, however, that this use of the mails did not constitute a violation of the statute. Judge Maris noted that the use of the mails was itself "intrinsically devoid of any element of fraud," and that "[i]t was only after the packing slips were received by [the defendants] that they were used ... as a convenient means of distinguishing those sales to be placed on the books from those to be included in the fraudulent scheme." *Id.* at 472. The Court concluded that the perpetrators of the fraudulent scheme has used the mails "merely as a convenient but not essential tool in carrying out [their] object." *Id.*

In Paladino's case, by contrast, resort to interstate wires was "essential" rather than "convenient" to the scheme in question, inasmuch as use of the computer link-up was necessary in order to print the tickets sold to TWA passengers. Whereas the court in *Tarnopol* could compare the case before it to *Maze* and conjecture that "it would appear that the fraud would have been better served if no packing slips had been in existence," *United States v. Tarnopol*, 561 F.2d at 274, a similar analysis cannot logically apply to the present case. If Paladino and Giovengo had had no access to the TWA computer system, they would have had no tickets to sell, and their plan to defraud the airline could never have succeeded.[6]

We conclude that Paladino's use of interstate wires was "for the purpose of executing" the fraudulent scheme he devised with Giovengo. Paladino's conduct was

---

**6.** Paladino's reliance on *United States v. Holmes*, 390 F.Supp. 1077 (W.D.Mo.1975), is also misplaced. In *Holmes* the government's theory was that the defendant's use of the wires helped conceal his embezzlement, thereby delaying complaint to the authorities and making apprehension of defendant less likely. The court in *Holmes* held that theory insufficient to establish a violation of § 1343, relying on *United States v. Maze*, 414 U.S. 395 (1974). Paladino and Giovengo, however, did not make use of the wires in order to conceal their fraud. Rather, communication with the Kansas City computer was a prerequisite for successful execution of their fraudulent plan. *See also United States v. Brown*, 583 F.2d 659, 664–66 (3d Cir. 1978) (mailings taking place after the object of the scheme has been accomplished are not sufficiently related to the plan to support a mail fraud conviction), *cert. denied*, 440 U.S. 909, 99 S.Ct. 1217, 59 L.Ed.2d 456 (1979).

therefore in violation of the federal wire fraud statute.

For the reasons set forth above, the judgment of the district court will be affirmed.