**UNITED STATES, Plaintiff,**

v.

**Samuel L. LEWIS, Jr., et al., Defendants.**

**Crim. No. 81–00035.**

United States District Court, M. D. Pennsylvania.

April 29, 1981.

---

Albert Murray, Asst. U. S. Atty., Scranton, Pa., for plaintiff.

Anthony B. Panaway, John P. Moses, Blythe Evans, Wilkes Barre, Pa., for defendants.

## MEMORANDUM AND ORDER

NEALON, Chief Judge.

## I. INTRODUCTION

The defendants in the instant action are accused of participation in an election fraud. The indictment, dated March 9, 1981, cites four persons. Bernard J. Wujcik holds the position of Luzerne County District Justice. Rudolph Ricko is employed by the Borough of Plymouth. Vincent J. Dougherty formerly worked for the Luzerne County Board of Elections ("LCBE"). Samuel L. Lewis, Jr., is an erstwhile employee of the Pennsylvania Department of Transportation. The Government charges that these individuals conspired to submit fraudulent absentee ballots in both the general election held on November 8, 1977 and the Democratic primary conducted in May 1978. All four defendants have moved to dismiss the indictment. Wujcik, moreover, has submitted additional motions seeking a separate trial, expanded discovery, and other procedural rulings. These matters require individual assessment.

## II. DISMISSAL OF THE INDICTMENT

According to the indictment, the crime occurred in three stages. Initially, the defendants accumulated absentee ballots obtained through the submission of fraudulent applications.[1] Second, they gained control of additional ballots by removing them from the LCBE or by "misleading . . . illiterate, . . . poorly educated, or apathetic voters" who had submitted their own applications. Third, the defendants then caused the fraudulent votes to be marked, validated, and mailed to the authorities for counting. In the view of the Government, this conduct amounted to three separate crimes: (1) mail fraud, (2) conspiracy to commit mail fraud, and (3) multiple voting in violation of the Voting Rights Act.[2]

■ Certain arguments appear in all four motions to dismiss. For example, every defendant contends that the indictment fails to allege a transgression of the mail fraud statute. The movants are also unanimous in their contention that the charges should be dismissed as vague. Wujcik has raised the separate defense of pre-indictment delay. Ricko's motion additionally claims that the decision to prosecute him rested on criteria that are constitutionally

---

1. The Government accuses Wujcik, Lewis, Ricko, and Dougherty of soliciting and procuring applications from voters who were ineligible to vote or unaffected by the special exigencies necessary to qualify for an absentee ballot. These applications allegedly contained a variety of misrepresentations, e. g., identity of the applicant, reasons for requesting the absentee ballot. Defendant Wujcik supposedly misused his notary public commission in submitting the bogus requests.

2. Wujcik is not accused of participation in the multiple voting.

unacceptable. In assessing these propositions, the court must assume that the allegations contained in the indictment are true. *Boyce Motor Lines v. United States*, 342 U.S. 337, 343 n.16, 72 S.Ct. 329, 332 n.16, 96 L.Ed. 367 (1952); *United States v. Bohonus*, 628 F.2d 1167, 1169 n.2 (9th Cir. 1980).

### A. Mail Fraud

The indictment clearly alleges that the overall purpose of the fraud was to "effect, modify and/or subvert" the results of two elections. Wujcik, Dougherty, Ricko, and Lewis argue that the mail fraud statute, 18 U.S.C. § 1341, outlaws only those schemes designed to divest the victim of money or other tangible property. Concededly, the instant case does not involve such a plan, since the defendants are in effect accused of denying the Commonwealth and its voters of their intangible right to a fair election. Thus, the mail fraud counts must be dismissed if the enactment only protects traditional proprietary interests. The defendants' theory shall be tested on two different grounds, *i. e.*, the actual wording of the provision and the relevant case law.

### 1. Text of the Mail Fraud Act

■ Generally, the primary step in the interpretation of a statute is analysis of the actual language. *Albernaz v. United States*, — U.S. —, —, 101 S.Ct. 1137, 1140, 67 L.Ed.2d 275 (1981). Section 1341 reads thusly:

> Whoever, having devised or intending to devise any scheme or artifice to defraud, *or* for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, *or* to sell, dispose of, loan, exchange, alter, give away, distribute, supply, or furnish or procure for unlawful use any counterfeit or spurious coin, obligation, security, or other article, or anything represented to be or intimated or held out to be such counterfeit or spurious article, for the purpose of executing such scheme or artifice or attempting so to do, places in any

post office or authorized depository for mail matter, any matter or thing whatever to be sent or delivered by the Postal Service, or takes or receives therefrom, any such matter or thing, or knowingly causes to be delivered by mail according to the direction thereon, or at the place at which it is directed to be delivered by the person to whom it is addressed, any such matter or thing, shall be fined not more than $1,000 or imprisoned not more than five years, or both. [emphasis added]

Review of this language demonstrates that the provision proscribes three types of "schemes" or "artifices"; namely, those designed: (1) "to defraud," (2) "for obtaining money or property by means of false or fraudulent pretenses, representations, or promises," and (3) "to ... distribute ... any counterfeit or spurious coin, obligation, security, or other article...." Furthermore, use of the word "or" between each of these classifications indicates that the categories are disjunctive. Accordingly, a plan need fit only one of the groupings in order to qualify for application of the statute. *United States v. States*, 488 F.2d 761, 763–64 (8th Cir. 1973), *cert. denied*, 417 U.S. 909, 94 S.Ct. 2605, 41 L.Ed.2d 212 (1974).

This language supports the Government. If the defendants' position were correct, then the first category, which prohibits schemes that "defraud," would have no meaning beyond the second, which concerns plans that seek "money or property by means of false or fraudulent pretenses." That interpretation would render the term "to defraud" mere surplusage since the phrase would have no independent significance. This type of construction is to be avoided in the absence of a clear indication that Congress intended such a result. *American Radio Relay League v. Federal Communications Commission*, 617 F.2d 875, 879 (D.C. Cir. 1980). Nothing in the text of § 1341 supports that conclusion.[3]

### 2. Review of the Precedents

■ The mail fraud law dates back to the late nineteenth century. There is little leg-

---

3. Indeed, the Historical and Revision Notes to § 1341 indicate that Congress has on occasion deliberately eliminated superfluous language from the statute.

islative history concerning the definition of the term "to defraud." *United States v. States*, 488 F.2d at 764. A certain tension exists in the cases that have reviewed the statute. On one hand, there is agreement that § 1341 must not be construed so expansively that the provision reaches matters of primarily local concern. *United States v. Giovengo*, 637 F.2d 941, 944 (3d Cir. 1980). Conversely, another body of authority has refused to give the law a narrow interpretation. In *United States v. Pearlstein*, 576 F.2d 531, 534–35 (3d Cir. 1978), for instance, our Court of Appeals ruled that the scope of the statute is "quite broad" and that the phrase "scheme or artifice to defraud" is "not defined according to any technical standards" but generally reaches "fraudulent misrepresentations or omissions calculated to deceive persons of ordinary prudence and comprehension." Reconciliation of these two principles requires careful analysis.

*United States v. McNeive*, 536 F.2d 1245 (8th Cir. 1976) involved an attempt by the Court of Appeals for the Eighth Circuit to place § 1341 in the proper perspective. The case concerned a city inspector who had accepted a number of gratuities from plumbing permit applicants. There was no evidence that the defendant had solicited such payments or that his performance in office was affected by the extra money. On the contrary, the defendant had simply benefited from a "tipping" custom that antedated his tenure. When the practice came to light, the United States Attorney prosecuted under the mail fraud statute. The Government contended that acceptance of the tips constituted a "scheme to defraud" which had been accomplished through use of the postal system.[4] A federal jury returned a conviction, but the Court of Appeals reversed.

The *McNeive* decision resembled the instant action in that the proper ruling hinged on the interpretation of the term "scheme or artifice to defraud." The panel acknowledged the paradoxical authorities alternatively calling for strict and liberal construction of the enactment and the dearth of helpful legislative history. *Id.* at 1247–48. After reviewing the various precedents, the Court of Appeals concluded that the plans proscribed by the statute fell into two general categories. The initial classification, which included the majority of cases, involved matters where the victims had been defrauded of "money or other tangible property interests." The panel, however, went on to explain that "[t]he second category of § 1341 deceptive schemes is comprised of those which operate to deprive individuals of intangible rights or interests." *Id.* at 1249.[5]

In *McNeive*, the alleged victims were the municipality and its residents. The record demonstrated that they had not suffered any fiscal or proprietary loss. The Government, therefore, maintained that the inspector had denied the city of its intangible "right to the loyal and honest service of its public officials." The Court of Appeals acknowledged that there was authority for such a contention.[6] Yet the evidence conclusively demonstrated that the inspector had neither concealed the tipping nor permitted the custom to influence his official actions. Under the facts of the case, the municipality had not actually been deprived of the conduct it deserved from its employee. Thus, the panel unanimously decided that the victims had not suffered the type of injury necessary to trigger § 1341.

There is overwhelming support for *McNeive's* observation that § 1341 protects certain "intangible" items. Three such interests have been recognized. The first, which was discussed in *McNeive*, upholds

---

**4.** The gratuities had been mailed to the inspector's office together with the permit applications.

**5.** In reaching this conclusion, *McNeive* in part relied on *United States v. States*. The latter case held that election fraud constituted a sufficient "scheme or artifice" to qualify for appli-

cation of the mail fraud statute. The *States* holding will be discussed more fully at a later point in this Memorandum.

**6.** Precedents supporting this conclusion shall be discussed in the succeeding paragraphs.

the right of the public to honesty and diligence on the part of governmental officials. *United States v. Mandel*, 591 F.2d 1347 (4th Cir. 1979), *rev'd on other grounds*, 602 F.2d 653 (4th Cir. 1979) (*en banc*), *cert. denied*, 445 U.S. 961, 100 S.Ct. 1647, 64 L.Ed.2d 236 (1980) presented a situation in which the Governor of Maryland had been bribed to take a particular position on pending legislation. The accused contended that their alleged offense did not fall within the ambit of the mail fraud law.[7] The Court of Appeals for the Fourth Circuit favorably cited *McNeive* for the proposition that § 1341 governed intangible as well as proprietary interests. The panel then stated that:

It is clear ... that the fraud involved in the bribery of a public official lies in the fact that the public official is not exercising his independent judgment in passing on official matters. A fraud is perpetrated upon the public to whom the official owes fiduciary duties, *e. g.*, honest, faithful and disinterested service. When a public official has been bribed, he breaches his duty of honest, faithful and disinterested service. While outwardly purporting to be exercising independent judgment in passing on official matters, the official has been paid for his decisions, perhaps without even considering the merits of the matter. Thus, the public is not receiving what it expects and is entitled to, the public official's honest and faithful service.

591 F.2d at 1362 (citations omitted). The *Mandel* opinion held that the defendants had denied the people of Maryland of their right to have the Governor exercise his independent judgment in office and to disclose conflicts of interest. Accordingly, the scheme was found within the statute. *Id.* at 1361–64. Three other circuits have held that such frauds transgress § 1341 if the mails are used. *United States v. Diggs*, 613 F.2d 988, 998 n.54 (D.C. Cir. 1979), *cert. denied*, 446 U.S. 982, 100 S.Ct. 2961, 64 L.Ed.2d 838 (1980); *United States v. Brown*, 540 F.2d 364, 373–75 (8th Cir. 1976); *United States v. Bush*, 522 F.2d 641, 651 (7th Cir. 1975). Another federal district court within this Commonwealth has also ruled that the public's interest in impartial office holders is protected by the statute. *United States v. Fineman*, 434 F.Supp. 189, 195 (E.D.Pa.1975) (Fullam, J.).[8]

The logic of *Mandel* and its related authorities has been expanded to cover a second "intangible" zone, *viz.*, the right of a business entity to honest and diligent employees. In *United States v. Barta*, 635 F.2d 999, 1005–07 (2d Cir. 1980), the Government charged that a securities trader associated with a small firm had concealed his personal interest in a particular client's account. The defendant also supposedly failed to inform his employer that the client was undercapitalized and a bad credit risk. When the client's account collapsed, the securities firm bore a substantial loss. The indictment, nevertheless, did not assert this financial injury as a basis for mail fraud prosecution. Rather, the

7. The *Mandel* defendants appealed on both substantive and procedural grounds. The original panel agreed that § 1341 reached the scheme in question but reversed the conviction because the district court had both admitted certain hearsay evidence and given faulty instructions. Sitting *en banc*, the Fourth Circuit reinstated the conviction. The ultimate decision, therefore, did not impair the persuasiveness of the panel opinion with regard to the scope of the mail fraud statute.

8. Undoubtedly, governmental units often suffer actual monetary harm when an official breaches his or her responsibilities of diligence and honesty. In such instances, the Government has an additional ground on which to assert a mail fraud prosecution. *See, e. g., United States v. Diggs*, 613 F.2d at 998. Financial injury, nevertheless, is not a prerequisite to application of § 1341. As the Court of Appeals for the Second Circuit explained while discussing the intangible interest principle:

This doctrine of the deprivation of honest and faithful services has developed to fit the situation in which a public official avails himself of his public position to enhance his private advantage, often by taking bribes. Such actions may not deplete the fisc; indeed, ... they may have enriched it, but they are nonetheless frauds since the public official has been paid to act in breach of his duties.

*United States v. Dixon*, 536 F.2d 1388, 1400 (2d Cir. 1976). *See also United States v. Castor*, 558 F.2d 379, 383 (7th Cir. 1977).

Government rested its entire case on the theory that the defendant had deprived the employer of "his honest and faithful services, as well as its right to decide what business risks to bear with all the facts before it." Emulating the *Mandel* approach, *Barta* first accepted the dichotomy between "tangible" and "intangible" interests protected by § 1341. The panel then agreed that the employer's right to impartial conduct on the part of its employees fell within the second category. The *Barta* court, therefore, upheld the validity of the indictment. This holding concurs with the positions of the Ninth and Seventh Circuits. *See United States v. Bohonus*, 628 F.2d at 1171–73; *United States v. Bryza*, 522 F.2d 414, 421–23 (7th Cir. 1976), *cert. denied*, 426 U.S. 912, 96 S.Ct. 2237, 48 L.Ed.2d 837 (1976).

The third type of intangible right safeguarded by the mail fraud law is best described as a miscellaneous grouping. Essentially, the subcategory contains a number of cases which have found § 1341 pro-tection in a variety of instances.[9] The most important of these items is the right to an honest election.

*United States v. States* confronted the Court of Appeals for the Eighth Circuit with a situation virtually identical to the present matter. The defendants had been convicted of attempting to further the cause of certain candidates by casting bogus votes. The scheme included the submission of absentee ballot applications on behalf of "phantom" electors. On appeal, the defendants raised the theory repudiated in so many other situations, *i.e.*, § 1341 is only triggered when the offender seeks money or property. The *States* opinion reviewed the applicable case law which rejected this contention. Ultimately, the panel concluded that the public's "intangible political and civil rights" fell within the protection of the mail fraud statute. The convictions were affirmed. 488 F.2d at 762–67. *See also United States v. Classic*, 35 F.Supp. 457, 458 (E.D.La.1940).[10]

**9.** Some of these decisions have concerned prosecutions under 18 U.S.C. § 1343, which outlaws "*any scheme or artifice to defraud*" which is effected "by means of wire, radio, or television." Our Court of Appeals has ruled that §§ 1341 and 1343 are so similar that cases interpreting one are applicable to the other. *United States v. Giovengo*, 637 F.2d at 944.

*United States v. Condolon*, 600 F.2d 7 (4th Cir. 1979) concerned a charlatan who masqueraded as a talent agent. The defendant had convinced certain women that in exchange for sexual favors he would assist them in achieving success in show business. While some of the aspiring actresses and models incurred expenses in preparing for their desired positions (*e. g.*, hiring baby sitters), none paid the agent an actual fee. Unfortunately, the defendant's promises were false, and the victims abased themselves in the process. The agent was convicted under § 1341 and, in his appeal, he sought reversal on the ground that he had not obtained any tangible property or breached a fiduciary relationship. The Court of Appeals disagreed. The panel found an intangible interest in the "time, effort, money, and expectations of which Condolon defrauded the women." *Id.* at 9.

In *United States v. Louderman*, 576 F.2d 1383 (9th Cir. 1978), *cert. denied*, 439 U.S. 896, 99 S.Ct. 257, 58 L.Ed.2d 243 (1978), certain individuals engaged in seeking out debtors posed as telephone company officials during phone conversations in order to elicit personal infor-mation. Again, the defendants sought to overturn their convictions under § 1343, because they had not deprived anyone of tangible property. Yet the convictions were affirmed when the appellate panel concluded that the victims' "right to privacy" was an intangible interest protected by the statute. *Id.* at 1387–88.

*United States v. Castor*, 558 F.2d at 383–84, offers another illustration of these miscellaneous authorities. The case involved individuals who sought to secure liquor licenses by submitting fraudulent applications to the state authorities. The Court of Appeals for the Seventh Circuit found the offense within § 1341. In argument on appeal, the defendants unsuccessfully asserted that the prosecution failed for lack of a proprietary deprivation. The panel assumed for the sake of argument that such an injury was necessary and found it in the harm to the other applicants. The *Castor* court, nonetheless, carefully began this hypothetical discussion with the following statement: "We are not persuaded that the prior cases embody any such requirement." *Id.* at 383.

**10.** The defendants have offered one citation for the argument that § 1341 only concerns swindles of tangible property. In *United States v. Randle*, 39 F.Supp. 759, 760 (W.D.La.1941), the district court applied this rationale in sustaining a demurrer to an indictment which alleged mail fraud in connection with an election scandal. The persuasiveness of that precedent,

In maintaining that the indictment should be dismissed for failure to allege deprivation of tangible property, the defendants are not merely asking this court to reject the *States* rationale. On the contrary, acceptance of their argument would require three preliminary steps which are inappropriate. First, the court would have to ignore the plain thrust of the language contained in § 1341 which indicates that the term "to defraud" protects more than "money or property." Second, a ruling for the accused would controvert the admonition of *United States v. Pearlstein*, 576 F.2d at 534–35, that the mail fraud statute not be enforced "according to any technical standards." Third, the defendants would have the court break with an impressive body of established precedent. *States* stands in the mainstream of case law which holds that § 1341 extends to intangible rights. The public's interest in unsullied elections is at least as important as the other non-monetary items already placed within the statute. *See, e. g., United States v. Condolon*, 600 F.2d at 9. A review of the applicable authorities requires denial of the motions to dismiss the mail fraud counts.

The court is well aware of the fact that considerable problems would arise from too expansive an interpretation of § 1341. The statute, for example, must not be construed to permit unwarranted federal intervention into the affairs of state government. *United States v. States*, 488 F.2d at 761 (Ross, J., concurring). In the instant case, however, the court does not write on a clean slate. The mail fraud statute has already been applied to punish corrupt state politicians in a variety of contexts. *See, e. g., United States v. Mandel*, 591 F.2d at 1361–64; *United States v. States*, 488 F.2d at 762–77; *United States v. Fineman*, 434 F.Supp. at 195. Without a doubt, there is a point at which the Federal Government's interest in proscribing a particular activity is so negligible that § 1341 should be construed to leave the matter to the states. *United States v. McNeive*, 536 F.2d at 1251–52. Case law, nevertheless, demonstrates that the instant action is not such a situation.[11]

Moreover, an overly-broad reading would also raise the possibility that the statute might become ambiguous with regard to particular defendants. This threat would be especially acute if courts augmented the scope of the term "to defraud" in an unprincipled manner. *See United States v. Caldwell*, 544 F.2d 691, 697–98 (4th Cir. 1976) (Widener, J., concurring). Criminal laws typically receive strict interpretation and a presumption exists against the expansion of federal jurisdiction into new areas. *United States v. Pavlick*, 507 F.Supp. 359, 363 (M.D.Pa.1980). Yet two factors render this rule inapplicable to Wujcik, Lewis, Ricko, and Dougherty. Initially, the court cannot be blind to the extensive judicial authority which has extended § 1341 to the type of crime presently at issue. Second, a fair reading of the statute gives ample notice that the act extends to the submission of bogus absentee ballots via the mails. As previously quoted, the provision outlaws all schemes "to defraud" which utilize the postal service. It would be untenable to suggest that individuals engaged in ballot stuffing do not realize that they are engaged in a "fraud" on the public, since by definition they are seeking to deceive the people on a matter of great concern.[12] Since § 1341 clearly outlaws the crime alleged in the indictment, the narrow con-

---

however, is overwhelmed by the weight of contrary authority which recognizes intangible interests. The current trend of cases requires that *Randle* not be applied.

**11.** The Supreme Court has recognized that federal prosecutions of state officials based on actions committed in office are not uncommon. *United States v. Gillock*, 445 U.S. 360, 373 n.11, 100 S.Ct. 1185, 1193, 63 L.Ed.2d 454 (1980). Even more importantly, a vital federal concern is at stake in the instant prosecution: integrity of the postal system. Section 1341 was designed to safeguard this interest. *United States v. Stout*, 499 F.Supp. 602, 604 (E.D.Pa. 1980).

**12.** The defendants have suggested only one reason for viewing § 1341 ambiguous: the argument that the provision solely guards tangible property. This position has been rejected.

struction rule does not support the defendants. *Perrin v. United States*, 444 U.S. 37, 49 n.13, 100 S.Ct. 311, 317 n.13, 62 L.Ed.2d 199 (1979). *See also Albernaz v. United States*, —— U.S. at ——, 101 S.Ct. at 1144.[13]

## B. Sufficiency of the Indictment

 This portion of the motion consists of two different arguments. First, Ricko, Lewis, and Dougherty contend that the counts concerning the Voting Rights Act failed to give them proper notice of the underlying charges. Second, all of the defendants attack the remainder of the accusations for vagueness. In assessing these propositions, it is necessary to note that a valid indictment must: (1) fairly inform the defendants of the allegations and (2) permit them to plead an acquittal or conviction to bar a future prosecution. *United States v. Bailey*, 444 U.S. 394, 414, 100 S.Ct. 624, 636, 62 L.Ed.2d 575 (1980); *Hamling v. United States*, 418 U.S. 87, 117, 94 S.Ct. 2887, 2907, 41 L.Ed.2d 590 (1974).

### 1. Voting Rights Act

 Multiple voting is prohibited by 42 U.S.C. § 1973i(e). There is little authority concerning the meaning of this provision. Accordingly, analysis must begin with a companion subsection. At 42 U.S.C. § 1973i(e), the Voting Rights Act states the following:

*False information in registering or voting; penalties.* Whoever knowingly or willfully gives false information as to his name, address, or period of residence in the voting district for the purpose of establishing his eligibility to register or vote, or conspires with another individual for the purpose of encouraging his false registration to vote or illegal voting, or pays or offers to pay or accepts payment either for registration to vote or for voting shall be fined not more than $10,000 or imprisoned not more than five years, or both. Provided, however, That this provision shall be applicable only to general, special, or primary elections held solely or in part for the purpose of selecting or electing any candidate for the office of President, Vice President, presidential elector, Member of the United States Senate, Member of the United States House of Representatives, Delegate from the District of Columbia, Guam, or the Virgin Islands, or Resident

---

**13.** At this point, the court shall discuss three other precedents that the defendants have cited. All of these authorities are distinguishable. *United States v. Rabbitt*, 583 F.2d 1014 (8th Cir. 1978), *cert. denied*, 439 U.S. 1116, 99 S.Ct. 1022, 59 L.Ed.2d 75 (1979), for example, concerned a Missouri legislator who solicited kickbacks from a firm seeking state contracts. Significantly, the defendant did not misuse his office in effecting the scheme. For this reason, the panel ruled that the legislator had not deprived the public of its right to "honest and fair dealing" on the part of officials. *Id.* at 1024–26. Like *McNeive*, *Rabbitt* stands for the proposition that a mail fraud prosecution must fail if the victim has not been "defrauded" of a valid interest within the meaning of the statute. The decision does not, however, suggest that § 1341 only protects tangible property.

In *United States v. Dixon*, 536 F.2d at 1388, the Court of Appeals for the Second Circuit reversed the conviction of a corporate president who had forwarded stockholders voting proxies which contained erroneous information. The panel reasoned that in view of his actual relationship with the victims, the defendant's action was not serious enough to breach any intangible interest the victims had in his honest conduct. *Id.* at 1398–1401. The *Dixon* opinion, however, prefaced this conclusion with the observation that § 1341 "must reach some schemes or artifices that do not in themselves involve 'obtaining money or property by means of false or fraudulent pretenses.'" *Id.* at 1398–99. The Second Circuit, moreover, has recently reaffirmed its belief that the statute protects intangible rights. *United States v. Barta*, 635 F.2d at 1005–07.

Finally, the defendants cannot find support in *United States v. Porter*, 591 F.2d 1048, 1055–58 (5th Cir. 1979). There, the Court of Appeals reviewed the conviction of several laboratory technicians who had paid kickbacks to physicians for referring Medicare patients to their facility. The Government charged that this action defrauded the United States of its interest in fair administration of the program. The panel's ruling largely rested on the following conclusion: "... the government has failed to demonstrate interference with any of its lawful functions." *Id.* at 1056. Once more, the precedent in no way detracted from the *States* rationale.

Commissioner of the Commonwealth of Puerto Rico.

Congress enacted this legislation to give the widest possible protection to the franchise of American citizens. Originally, the bill was designed to cover all elections, state or federal. The language qualifying the scope of the legislation to races in which national offices are at stake was added to protect the statute from a constitutional attack. *United States v. Cianciulli*, 482 F.Supp. 585, 613–15 (E.D.Pa.1979).[14]

█ Section 1973i(c) remains a broad provision even with the limitation pertaining to federal elections. As the Court of Appeals for the Fifth Circuit held in *United States v. Bowman*, 636 F.2d 1003, 1012 (5th Cir. 1981), the statute is:

> an exercise of the Congressional power to regulate federal elections by regulating activities which have the potential to affect such elections. . . . § 1973i(c) may be constitutionally applied to prohibit any activity that *has the potential* to affect the integrity and purity of a federal election where both federal and the state or local races are on the ballot. . . [emphasis added]

For this reason, the statute proscribes fraudulent voting in every election where national candidates are on the ballot. The enactment also outlaws *all* fraudulent registrations, regardless of when they are effected, because the qualification of a phantom voter could corrupt federal elections held in future years. *United States v. Cianciulli*, 482 F.Supp. at 618. *See also United States v. Barker*, 514 F.2d 1077, 1080–82 (7th Cir. 1975); *United States v. Lewin*, 467 F.2d 1132, 1136 (7th Cir. 1972); *Annot.*, 23 A.L.R. Fed. 463 (1975).

In the instant indictment, the defendants are accused of violating § 1973i(e), which reads:

> *Multiple voting; penalty.* (1) Whoever votes more than once in an election referred to in paragraph (2) shall be fined not more than $10,000 or imprisoned not more than five years, or both.

(2) The prohibition of this subsection applies with respect to any general, special, or primary election held solely or in part for the purpose of selecting or electing any candidate for the office of President, Vice President, presidential elector, Member of the United States Senate, Member of the United States House of Representatives, Delegate from the District of Columbia, Guam, or the Virgin Islands, or Resident Commissioner of the Commonwealth of Puerto Rico.

(3) As used in this subsection, the term "votes more than once" does not include the casting of an additional ballot if all prior ballots of that voter were invalidated, nor does it include the voting in two jurisdictions under section 202 of this Act [42 USCS § 1973aa–1], to the extent two ballots are not cast for an election to the same candidacy or office.

As the statutory language indicates, this enactment concerns the same type of elections safeguarded by Subsection (c). The only distinction concerns the particular abuse proscribed. As the language of Subsection (e) plainly states, the provision outlaws multiple voting.

█ The Government's allegations in this regard are quite concise. The indictment simply states that Lewis, Dougherty, and Ricko voted more than once in the 1978 primary, since every one of them cast at least one bogus absentee ballot as well as his own legitimate vote.[15] In short, the Government has clearly accused the three defendants of committing a proscribed act in a protected election. The indictment must stand.

### 2. Remainder of the Allegations

In their attack on the pleading of the mail fraud charges, the defendants place heavy reliance on *United States v. Curtis*, 506 F.2d 985 (10th Cir. 1974). The defendant in that case had established a "Computer Matching Institute" which promised to

---

14. *Cianciulli* contains an extensive review of the relevant legislative history.

15. Of course, 1978 was a Congressional election year.

arrange marriages and other romantic encounters for its clients. In reality, the operation was a sham which swindled unwary consumers. The Government prosecuted under § 1341. Following his conviction, the defendant appealed. The *Curtis* panel began by noting that the language of the indictment simply tracked the wording of the statute. The charges did not give the defendant any clear idea as to the nature of the "scheme and artifice to defraud" that he had allegedly perpetrated. Indeed, the accusations were so vague that "the grand jury may have had a concept of the scheme essentially different from that relied upon by the Government before the trial jury." *Id.* at 989. Consequently, the *Curtis* opinion ruled the indictment invalid and overturned the conviction. *Id.* at 988–92. *See also United States v. Nance*, 533 F.2d 699, 701 (D.C. Cir. 1976).

Our Court of Appeals distinguished the *Curtis* precedent in *United States v. Adamo*, 534 F.2d 31 (3d Cir. 1976), *cert. denied*, 429 U.S. 841, 97 S.Ct. 116, 50 L.Ed.2d 110 (1976). The defendant had been found guilty of executing a credit card swindle. Part of his appellate argument consisted of an assault on the indictment under the *Curtis* rationale. On behalf of a unanimous panel, Judge Rosenn sustained the Government's charges because they "explicitly outline[d] the elements of the fraudulent plan." 534 F.2d at 36. *See also United States v. Caldwell*, 544 F.2d at 694–95; *United States v. Cohen*, 516 F.2d 1358, 1366–67 (8th Cir. 1975).

 The instant matter clearly parallels *Adamo*. In order to sustain a mail fraud conviction, the Government must show that the defendant *employed the postal system* in order *to execute a scheme to defraud. United States v. Brown*, 583 F.2d

659, 664 (3d Cir. 1978), *cert. denied*, 440 U.S. 909, 99 S.Ct. 1217, 59 L.Ed.2d 456 (1979). *See also United States v. Zemek*, 634 F.2d 1159, 1180 (9th Cir. 1980).[16] As already explained, the supposed plan constitutes an offense under the statute. The allegations, moreover, set forth the specific acts that the accused supposedly perpetrated in the furtherance of the scheme, and identify the "phantoms" in whose names the fraudulent votes were cast. Finally, the Government has charged that as part of the fraud the defendants mailed the bogus votes to the LCBE. In light of the relevant authorities, the court finds that the indictment contains sufficient specificity to apprise Wujcik, Dougherty, Ricko, and Lewis of the allegations they face and to protect their interests under the Double Jeopardy Clause.

## C. Selective Prosecution

 Ricko's claim on this issue lacks merit. To prevail on a selective prosecution theory, a defendant must show that the decision to bring the action sprang from either invidious discrimination, *e. g.*, racial or religious, or an intention to punish the exercise of a fundamental right. *United States v. Berrigan*, 482 F.2d 171, 174 (3d Cir. 1973); *see also United States v. Niemiec*, 611 F.2d 1207, 1209 (7th Cir. 1980); *United States v. Johnson*, 577 F.2d 1304, 1308 (5th Cir. 1978). *Cf. Barton v. Malley*, 626 F.2d 151, 155 (10th Cir. 1980).[17] Ricko has alleged nothing that would even justify a hearing on the issue.

## D. Pre-Indictment Delay

There is no question that the grand jury returned the indictment against the defendants within the applicable five year period established by the statute of limitations. 18 U.S.C. § 3282. Defendant Wujcik,

---

**16.** In *Pearlstein*, our Court of Appeals stated that there were three elements to a § 1341 offense:

 1) the existence of a scheme to defraud; 2) the use of the mails in furtherance of the fraudulent scheme; and 3) culpable participation by the defendant.

576 F.2d at 534. This three-pronged test, of course, is simply a rearticulation of the *Brown*-

*Zemek* analysis, and, for the purposes of the instant Memorandum, the use of either framework will yield the same result.

**17.** *Barton* and *Johnson* add an additional requirement, *viz.*, the defendant must show that other persons similarly situated have generally not been prosecuted for the conduct in question.

nevertheless, has argued that the Government initiated the prosecution well after it had supposedly obtained the evidence to proceed.[18] He further contends that he has been prejudiced by this dilatory action and, therefore, merits dismissal of the indictment.

■ The Supreme Court of the United States considered a similar argument in *United States v. Lovasco*, 431 U.S. 783, 97 S.Ct. 2044, 52 L.Ed.2d 752 (1977). On behalf of the majority, Justice Marshall admonished the federal judiciary to exercise great caution in second-guessing a prosecutor's decision to bring a case at a particular time within the limitation period. In reinstating an indictment dismissed at the district level, the *Lovasco* Court held that the Government's delay would only prevent the defendants' trial if the stall flouted general concepts of "decency and fair play." Indeed, Justice Marshall cited *Rochin v. California*, 342 U.S. 165, 173, 72 S.Ct. 205, 210, 96 L.Ed. 183 (1952) to illustrate the proper standard of review. Subsequent rulings have underscored the fact that *Lovasco* sets a high standard for any pre-indictment delay contention. These authorities have generally held that a defendant can only prevail if the court finds that the accused suffered substantial prejudice and that the delay occurred for an impermissible reason, such as an attempt to gain a tactical advantage. *United States v. Dennis*, 625 F.2d 782, 794 (8th Cir. 1980); *United States v. Heldon*, 479 F.Supp. 316, 320 (E.D.Pa.1979).

■ To support the motion to dismiss, Wujcik's counsel has submitted an affidavit which describes the "prejudice" suffered by his client.[19] This document contains vague generalities. For example, counsel asserts that some witnesses suffer from faded memories and that certain records which may have assisted the defense have been destroyed. As a matter of law, these difficulties are insufficient to sustain a pre-in-

dictment delay theory. *United States v. Marion*, 404 U.S. 307, 325–26, 92 S.Ct. 455, 466, 30 L.Ed.2d 468 (1971); *United States v. Stone*, 633 F.2d 1272, 1274 (9th Cir. 1979).

Wujcik has no *per se* right to a pre-trial evidentiary hearing. *See Watkins v. Sowders*, —— U.S. ——, 101 S.Ct. 654, 659, 66 L.Ed.2d 549 (1981). His pre-indictment claim would fail even if he could prove the assertions in his attorney's affidavit. Thus, there is no reason to hold a hearing on the matter.

### III. PROCEDURAL MATTERS

■ Wujcik has filed several motions seeking to affect the procedural course of this case. Initially, he seeks to sever his trial from that of his co-defendants. He gives two reasons for a separate proceeding. First, the movant claims that he would be prejudiced by a joint trial, because the Government would have the opportunity to enter a large volume of evidence pertaining to Lewis, Dougherty, and Ricko. Wujcik maintains that in such a situation he would suffer from "collective culpability." In the absence of a more concrete showing of prejudice, this argument is outweighed by the policy that alleged co-conspirators should be tried together. *United States v. Boyd*, 595 F.2d 120, 125 (3d Cir. 1978). Wujcik also claims that a joint proceeding will impair his ability to elicit exculpatory testimony from his co-defendants. The movant's counsel has submitted an affidavit stating that based on "information and belief" he thinks that the other accused individuals would testify on Wujcik's behalf in a separate trial. This proffer gives few details concerning the contents of the potential evidence. The affidavit merely states that Lewis, Dougherty, and Ricko might deny that the movant took part in any conspiracy to defraud the voters.[20] This offer of proof is too vague to justify severance. *United States v. Haro-Espinosa*, 619 F.2d 789, 793 (9th Cir. 1979); *United States v. Butler*, 611

---

**18.** Wujcik claims that the hiatus lasted nearly three years.

**19.** *See* the item attached to Document 9 of the Record.

**20.** *See* the attachment to Document 16 of the Record.

F.2d 1066, 1071 (5th Cir. 1980), *cert. denied*, —— U.S. ——, 101 S.Ct. 97, 66 L.Ed.2d 35 (1980); *United States v. Stout*, 499 F.Supp. 605, 606–07 (E.D.Pa.1980).

 The movant also seeks access to the grand jury minutes and expanded discovery beyond that normally permitted by the Federal Rules of Criminal Procedure and the Jencks Act. Such an extraordinary measure is usually limited to instances in which the defendant can demonstrate a "particular need" for the additional information. A desire to embark on a "fishing expedition," conversely, will not justify discovery beyond that which generally accrues to the accused. *See, e. g., United States v. Ferreboeuf*, 632 F.2d 832, 835 (9th Cir. 1980); *United States v. Tucker*, 526 F.2d 279, 282 (5th Cir. 1976); *cert. denied*, 425 U.S. 958, 96 S.Ct. 1738, 48 L.Ed.2d 203 (1976).[21] In the instant matter, the request fails for want of a special need.

Wujcik has submitted a motion for a very detailed bill of particulars. Indeed, the inquiry is nearly as particularized as a set of civil interrogatories. The Government has complied with a number of the requests voluntarily. After a careful review of the remaining items, the motion for expanded disclosure is denied. *United States v. Salazar*, 485 F.2d 1272, 1277 (2d Cir. 1973), *cert. denied*, 415 U.S. 985, 94 S.Ct. 1579, 39 L.Ed.2d 882 (1974). The movant has further requested an opportunity to conduct individual *voir dire* of potential jurors and to exercise additional peremptory challenges. There appears to be no justification for the court at this time to order such a diversion from the normal procedure. Finally, the court shall grant Wujcik's motion for a pretrial conference, which will be held on Wednesday, May 6, 1981 in Chambers at 1:00 P.M. Counsel for all defendants are required to attend.

21. Counsel for Wujcik has submitted another affidavit stating that on the basis of his investigation he has reason to believe that the Government did not present the grand jury with enough evidence to justify an indictment.

*See* the attachment to Document 12 of the Record. No details are given to substantiate this proposition; such a bald assertion is insufficient to justify the relief sought.