UNITED STATES of America, Appellee,

v.

Charles T. WALSH and Bowe, Walsh & Associates, Defendants-Appellants.

Nos. 42, 43, Dockets 82–1077, 82–1079.

United States Court of Appeals, Second Circuit.

Argued Sept. 21, 1982.

Decided Feb. 11, 1983.

As Amended April 6, 1983.

Paul R. Grand, New York City (Diana D. Parker, Lawrence S. Bader, Grand & Ostrow, New York City, of counsel), for defendants-appellants.

Lawrence J. Zweifach, Asst. U.S. Atty., Brooklyn, N.Y. (Edward R. Korman, U.S. Atty., E.D.N.Y., Mary McGowan Davis, Francis J. Murray, Asst. U.S. Attys., Brooklyn, N.Y., of counsel), for appellee.

Before FRIENDLY, MESKILL and CARDAMONE, Circuit Judges.

CARDAMONE, Circuit Judge:

Charles T. Walsh and Bowe, Walsh & Associates (BWA) appeal from judgments of conviction entered on February 16, 1982 in the United States District Court for the Eastern District of New York following a jury trial before the Honorable George C. Pratt. We affirm.

## I BACKGROUND

This case centers around BWA, a Long Island-based engineering firm, and Walsh, its senior partner and principal owner. Over a 12-year period ending in 1979 appellants engaged in an audacious pattern of corrupt and illegal activities in New York, New Jersey and Connecticut. As consulting engineers on a number of major sewer construction projects in the tri-state area, and with the connivance of others, appellants extorted money from project contractors under their control and fraudulently overstated payment claims. Equally outrageously appellants then used the proceeds

of these illegal actions to bribe public officials in order to obtain additional contracts and other forms of preferential treatment from the municipalities they were ostensibly serving. Appellants' actions bring to mind George Jacques Danton's famous phrase—l'audace, encore de l'audace, toujours de l'audace (audacity, more audacity, always audacity)—coined during a speech delivered before the French Legislative Assembly in 1792. H. Stephens, *The Principal Speeches of the Statesman and Orators of the French Revolution: 1789–1795* 166 (1891).

In 1967 Walsh, who made all of BWA's major management decisions and top-level client contacts, informed Edward Higgins, the second-ranking employee of BWA, that he needed cash to make payments to various politicians and elected officials in Rockland County, New York. At that time BWA was serving as primary consulting engineer on a major sewer project in Rockland County (the Rockland Project). Shortly after Walsh and Higgins conversed, they met with Paul Mundt, then Chairman of the Rockland County Sewer District's Board of Commissioners. Mundt agreed to use his position on the Board to resolve favorably any problems regarding bills submitted to Rockland County by BWA. In exchange Walsh agreed to overstate payment claims of Rockland Project contractors (which BWA had responsibility to review before submission to the County), take kickbacks on the resulting overcharges from the contractors whose claims were inflated, and remit a fixed percentage of the kickbacks to Mundt. At Walsh's direction, Higgins inflated several contractors' payment certificates, collected cash kickbacks from the contractors, and stored the cash in a safe deposit box in his own name. The cash was delivered to Walsh when needed for payment to Mundt. Higgins was assisted in these activities, again at Walsh's direction, by Martin Gabey, another BWA employee.

In addition to the payoffs to Mundt, Higgins and Walsh also paid off officials of the Township of Parsippany-Troy Hills, New Jersey where BWA held a similar primary consultant position on a major sewer project (the Parsippany Project). In particular, Walsh directed Higgins to make regular cash payments to Max Auerbach, Business Administrator of Parsippany-Troy Hills, in order to resolve problems created by the Township's dilatory payments to BWA. Having greased the ways, the processing of BWA's payment claims was expedited. After Higgins left BWA in 1974, Walsh himself delivered the periodic payments to Auerbach. Payments were also made to Parsippany's mayor.

In 1971 Walsh arranged for payments to a public official of Wallingford, Connecticut, still another municipality engaged in a large scale sewer project (the Wallingford Project). The official paid in this instance was one Guy Pilla, then Chairman of Wallingford's Public Utility Commission. The payments to Pilla totaled over $5,000 and on one occasion in 1971 Walsh actually passed $2,000 to Pilla in the men's room of a Connecticut restaurant. Although Pilla later insisted that the payments were merely a loan, he never made any attempt to repay Walsh. Between 1970 and 1977 the Commission, which granted and supervised engineering contracts on behalf of the town, approved a series of BWA contracts and proposals relating to the Wallingford Project. Pilla consistently voted to approve BWA proposals.

In 1971 BWA also received lucrative engineering contracts on a municipal works project in Suffolk County, New York (the Suffolk Project). These contracts were purportedly obtained with the assistance and influence of Nicholas Barbato, then Chairman of the Smithtown, Long Island Republican Committee, to whom BWA had promised a kickback of three percent of its design fees. Instead of inflating contractors' claims to raise the cash needed for the payoff to Barbato, the modus operandi in the Rockland and Parsippany Projects payoffs, Walsh and Higgins extorted the necessary cash from Suffolk Project contractors with threats of economic reprisals.

Yet another in the saga of sewer projects on which BWA worked was one located in

Camden County, New Jersey (the Camden Project). BWA received a contract on the Camden Project in 1977 after promising Camden Mayor Angelo Errichetti $40,000 for his help in getting it. Walsh later mailed Errichetti a BWA proposal for a study of the City of Camden's sewer system. Errichetti initially refused to cooperate on this proposal because BWA had failed to come through on the earlier promised $40,000. On August 8, 1979 Vincent Cuti, General Counsel for BWA, met with Mayor Errichetti at a hotel in Cherry Hill, New Jersey. Unfortunately for appellants the meeting was also attended by informant Melvin Weinberg and F.B.I. undercover agent Anthony Amoroso, both participants in an ongoing ABSCAM investigation of Errichetti. At the meeting Cuti said that BWA had attempted to deliver the $40,000 bribe to Errichetti for his influence on the Camden Project contract, that he would "straighten out" the problem caused by Errichetti's failure to receive the bribe, and that BWA wished to obtain work in the City of Camden. On August 20 Walsh and Cuti met with Errichetti, Amoroso and Weinberg in New York City. During this meeting Walsh reaffirmed that Errichetti would soon be paid to "rejuvenate" BWA's proposal for work in Camden. Finally, on September 10, 1979 Errichetti traveled to New York City where Cuti passed $10,000 in cash to Weinberg stating that "this is for the mayor." Weinberg and Amoroso then delivered the payment to Errichetti.

On April 22, 1981 a federal grand jury returned a seven count indictment against Walsh, BWA and four other defendants: Barbato, Cuti, Errichetti, and Gabey. Count one charged Walsh and Gabey with conducting the affairs of BWA through "a pattern of racketeering activity" in violation of 18 U.S.C. § 1962(c), part of the Racketeer Influenced and Corrupt Organizations Act (RICO). Count two charged Walsh, BWA and Gabey with conspiracy to defraud and commit offenses against the United States in violation of 18 U.S.C. § 371. Count three alleged that Walsh and Gabey traveled in interstate commerce with the intent to make illegal payments to public officials in violation of the Travel Act, 18 U.S.C. § 1952. Count four charged Walsh and Gabey with extortion in violation of the Hobbs Act, 18 U.S.C. § 1951. Counts five and six charged Walsh, Errichetti and Cuti with further violations of the Travel Act, and count seven alleged that Walsh, BWA and Barbato conspired to commit offenses against the United States in violation of 18 U.S.C. § 371.

Following a jury trial, Walsh was found guilty on counts one through seven, BWA guilty on counts two and seven, Cuti guilty on counts five and six, and Barbato not guilty on count seven.[1] The jury also returned a special verdict against Walsh on count one, requiring him to forfeit 55 percent of his interest in BWA pursuant to the forfeiture provision of RICO, 18 U.S.C. § 1963(a)(2). Judge Pratt subsequently sentenced Walsh to an aggregate term of imprisonment of twelve years, fined him $85,000, and fined BWA $20,000.

## II SUFFICIENCY OF THE EVIDENCE

To establish Walsh's RICO violation the government had to prove that Walsh committed at least two predicate offenses, *see* 18 U.S.C. § 1961(5), one of which occurred within the federal five-year statute of limitations for non-capital offenses, 18 U.S.C. § 3282 (1976). *See United States v. Field,* 432 F.Supp. 55, 59 (S.D.N.Y.1977), aff'd mem., 578 F.2d 1371 (2d Cir.), *cert. dismissed,* 439 U.S. 801, 99 S.Ct. 43, 58 L.Ed.2d 94 (1978). The government filed its original indictment on April 9, 1981; it therefore had to show that a predicate act occurred after April 9, 1976. In its special verdict the jury found that Walsh committed six predicate offenses subsequent to and nine predicate offenses prior to April 9, 1976. Claiming that none of the six post-April 9 predicate offense findings were supported by sufficient evidence, Walsh argues that the government failed to show the

1. The trials of Errichetti and Gabey were severed from the trial of this case.

requisite RICO predicate within the limitations period.[2]

On appeal from a criminal conviction the evidence is viewed in the light most favorable to the government, *Glasser v. United States,* 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942), and all issues of credibility are considered within the exclusive province of the jury, *United States v. Sprayregen,* 577 F.2d 173, 174 (2d Cir.), *cert. denied,* 439 U.S. 979, 99 S.Ct. 563, 58 L.Ed.2d 649 (1978). Inasmuch as the government needed to prove only one predicate offense within the limitation period, we need not look beyond one of the predicates submitted to the jury to find that Walsh's RICO conviction was supported by sufficient evidence. We choose for this purpose the predicate labeled 6(e) in the indictment. Predicate 6(e) alleged that between 1977 and 1979 Walsh and Gabey extorted approximately $100,000 from a contracting firm named D.A. & L. Caruso, Inc. (Caruso) in violation of the Hobbs Act. While Walsh claims that the government's proof of predicate 6(e) related solely to Gabey, the record contains sufficient evidence from which a rational juror could conclude that Walsh, as the head of BWA, actually participated in and directed Gabey's extortion of Caruso. A prosecution witness testified that in 1977 Gabey met with Augustine Caruso, Caruso's Secretary, and demanded $100,000 to resolve certain "contract problems" relating to Caruso's work on the Parsippany Project. He stated that the meeting was held in a conference room at BWA's office and Walsh himself entered and left the conference room several times during the meeting. At the meeting Gabey, BWA's "administrator," explained to Caruso that BWA needed cash to develop new business and asked Caruso to make the payments on BWA's behalf to two Parsippany-Troy Hills officials, Mayor John Fahey and Max Auerbach. Trial testimony further showed that prior to 1974 Higgins had extorted approximately $150,000 from Caruso at Walsh's direction. According the jury's findings the appropriate deference, we cannot say that the evidence was insufficient to support the inference that Walsh directed Gabey's 1977 demand on Caruso.

Walsh also argues that the government's evidence was inadequate to support the Hobbs Act (count four) and Travel Act (counts three, five and six) convictions. With respect to the Hobbs Act,[3] Walsh's conviction was based upon his having aided and abetted the same 1977 extortion of Caruso that constituted RICO predicate 6(e). "To aid and abet the commission of a crime, a defendant must in 'some sort associate himself with the venture, ... participate in it as something that he wishes to bring about, [and] seek by his action to make it succeed.'" *United States v. Clemente,* 640 F.2d 1069, 1078–79 (2d Cir.1981) (quoting *United States v. Peoni,* 100 F.2d 401, 402 (2d Cir.1938)). As already indicated there was more than ample evidence that Walsh sought to bring about and actually directed the 1977 extortion of Caruso. Such deliberate involvement provided a sufficient basis for the count three aiding and abetting conviction.

Appellant's arguments regarding the sufficiency of evidence underlying his Travel Act convictions require more detailed discussion. The Travel Act prohibits travel in interstate commerce with the intent to pro-

---

**2.** The court instructed the jury on the statute of limitations applicable in the RICO count, but did not give a statutory limitations instruction on count seven. We consider that omission in Part III of this opinion.

**3.** The Hobbs Act, 18 U.S.C. § 1951 (1976), provides in pertinent part:

(a) Whoever in any way or degree obstructs, delays, or affects commerce or the movement of any article or commodity in commerce by robbery or extortion or attempts or conspires so to do, or commits or threatens physical violence to any person or property in furtherance of a plan or purpose to do anything in violation of this section shall be fined not more than $10,000 or imprisoned not more than twenty years, or both

(b) As used in this section—

(2) The term "extortion" means the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear, or under color of official right.

mote "any unlawful activity." 18 U.S.C. § 1952(a) (1976). So far as here pertinent "unlawful activity" is "bribery . . . in violation of the laws of the State in which committed." 18 U.S.C. § 1952(b) (1976). Count three charged that Walsh violated the Travel Act by travelling from New York to New Jersey with the intent to commit bribery in violation of New Jersey law. Specifically, it alleged that Walsh travelled to New Jersey to pay Max Auerbach in order to obtain "favorable treatment" for BWA, including expeditious processing of contract claims, and that such payments were illegal bribes under New Jersey's then-existing bribery statute, N.J. Stat.Ann. 2A:93–6.[4] Count five charged that Walsh violated the Travel Act by aiding and abetting Cuti's travel to New Jersey for the purpose of bribing Errichetti, in violation of N.J.Stat.Ann. 2A: 93–6. Finally, count six charged that Walsh violated the Travel Act by aiding and abetting Errichetti's travel to New York City to receive a $10,000 bribe in violation of N.J.Stat.Ann. 2A:85–14 and 2A:93–6 and New Jersey's present bribery statutes, N.J.Stat.Ann. 2C:27–2, 2C:27–4, 2C:27–6.

■ With respect to count three, Walsh argues that Auerbach was paid merely to expedite the processing of BWA's bills and that BWA's payment for such favorable treatment did not constitute bribery under

New Jersey law because it did not involve the intent to corrupt the integrity of a public office. Walsh concludes, therefore, that the government failed to establish the requisite intent to commit "unlawful activity" necessary to support a Travel Act violation. We reach a contrary conclusion. Under New Jersey law the necessary *mens rea* for the offense of bribery is an intent to "subject the official action of the recipient to the influence of personal gain or advantage rather than public welfare." *State v. Begyn,* 34 N.J. 35, 167 A.2d 161, 167–68 (1961); *see also State v. Sherwin,* 127 N.J. Super. 370, 317 A.2d 414, 418 (N.J.Super.Ct. App.Div.1974). Under this standard Walsh's attempt to obtain preferential payments from Auerbach satisfies the *mens rea* requirement for bribery. BWA's payments to Auerbach were clearly intended to influence a public employee's performance of his official actions, and as such constituted the requisite "assault on the integrity of a public office" necessary to support a New Jersey bribery conviction, *United States v. Dansker,* 537 F.2d 40, 48 (3d Cir.1976), *cert. denied,* 429 U.S. 1038, 97 S.Ct. 732, 50 L.Ed.2d 748 (1977). In our view the evidence sufficiently established that Walsh's payments to Auerbach were bribes in violation of New Jersey law.

■ Walsh advances a similar argument with respect to the "unlawful activity" un-

---

**4.** N.J.Stat.Ann. 2A: 93–6 (West 1969) (repealed 1979) provides as follows:

> Any person who directly or indirectly gives or receives, offers to give or receive, or promises to give or receive any money, real estate, service or thing of value as a bribe, present or reward to obtain, secure or procure any work, service, license, permission, approval or disapproval, or any other act or thing connected with or appertaining to any office or department of the government of the state or of any county, municipality or other political subdivision thereof, or of any public authority, is guilty of a misdemeanor.

In 1979 the New Jersey legislature replaced 2A: 93–6 with two new statutes, N.J.Stat.Ann. 2C: 27–2, and 2C: 27–6 (West Supp.1982). Section 2C: 27–2 provides, in pertinent part, as follows:

> A person is guilty of bribery if he directly or indirectly offers, confers or agrees to confer upon another, or solicits, accepts or agrees to accept from another:

> a. Any benefit as consideration for a decision, opinion, recommendation, vote or exercise of discretion of a public servant, party official or voter on any public issue or in any public election; or
> b. Any benefit as consideration for a decision, vote, recommendation or exercise of official discretion in a judicial or administrative proceeding; or
> c. Any benefit as consideration for a violation of an official duty of public servant or party official; or
> d. Any benefit as consideration for the performance of official duties.

Section 2C:27–6 provides in part:

> b. A person commits a crime if he, directly or indirectly, confers or agrees to confer any benefit not allowed by law to a public servant to influence the performance of his official duties.

derlying Travel Act counts five and six. He contends that Errichetti was not bribed under New Jersey law because BWA was only attempting to secure fair treatment from Errichetti and placate Errichetti's anger over failure to receive the bribe promised him earlier. Even accepting Walsh's contention that an attempt to secure "fair treatment" is not bribery, Errichetti promised to do far more for BWA than merely consider its proposals for work in Camden. Errichetti was offered and actually accepted $10,000 in exchange for his promise to exercise official influence on BWA's behalf. The entire situation leaves no doubt that the payments were offered and made to Errichetti with the intent to undermine the integrity of public office and that, therefore, the payments and promises of payments were bribes in violation of N.J.Stat. Ann. 2A: 93–6 and N.J.Stat.Ann. 2C: 27–2.

■ Walsh further attacks his count five and six aiding and abetting convictions on the grounds that any offers of payment or actual payments to Errichetti were made by Cuti alone, without Walsh's knowledge, participation or consent. This claim is amply refuted by the record which indicates that Cuti was in fact acting at Walsh's behest when he offered bribes to Errichetti and subsequently paid Errichetti. The evidence discloses that in August 1979 Walsh and Cuti met with Errichetti and others in New York to discuss, among other things, Walsh's nonpayment of the bribe previously promised Errichetti. At this meeting Walsh reaffirmed that payments would be made in order to "rejuvenate" BWA's Camden work and advised Errichetti that Cuti was his "emissary" on the Camden project. Viewing the evidence in the light most favorable to the government, the jury could have concluded that Walsh facilitated, directed, and therefore aided and abetted Cuti's bribery of Errichetti.

■ Walsh also challenges his count six conviction on the ground that there was insufficient evidence to support the jury's conclusion that Walsh caused Errichetti's travel to New York on September 10 to receive a bribe. In particular, Walsh asserts that Errichetti knew nothing about receiving a bribe from BWA in New York until after Errichetti had arrived there. Again, there was ample evidence for the jury to conclude otherwise. Throughout August 1979 Errichetti was informed by Walsh's agents and Walsh himself that a payoff was imminent. Errichetti was also advised that the payment would be delivered through Cuti and Melvin Weinberg. On September 5, 6 and 9, 1979 Errichetti and Weinberg made plans to meet and conduct business on September 10 in New York. In connection with this proposed meeting, Weinberg informed Errichetti that an undisclosed party would soon be paying the Mayor some money. Based upon this evidence the jury was entitled to infer that Walsh deliberately prompted and therefore aided and abetted Errichetti's trip to New York and that Errichetti travelled with the expectation of either being paid by BWA or at least further discussing the payment.

■ While appellant asserts that Errichetti travelled to New York for other business reasons, unlawful activity need not be the sole purpose of interstate travel for the Travel Act to be violated. Where travel is motivated by two or more purposes, some of which lie outside the ambit of the Travel Act, a conviction is still possible if the requisite illegal purpose is also present. *See United States v. Barbieri,* 614 F.2d 715, 718 (10th Cir.1980). Thus, the government only had to establish under count six that one of Errichetti's purposes in travelling to New York on September 10 was to facilitate and promote bribery in violation of New Jersey law.

■ Walsh also attacks his aiding and abetting conviction under count six on the ground that the Travel Act required proof of Errichetti's intent to violate New York law, as opposed to New Jersey law, and that no such intent was shown. While a Travel Act violation consists of interstate travel with intent to promote "unlawful activity" and thereafter some actual or attempted promotion of that "unlawful activity," *see United States v. Goldfarb,* 643 F.2d 422, 433 (6th Cir.), *cert. denied,* 454 U.S.

827, 102 S.Ct. 118, 70 L.Ed.2d 101 (1981), the Act's definition of "unlawful activity" as including bribery "in violation of the laws of the state *in which committed*" (emphasis supplied), does not require the government to prove that the alleged "unlawful activity" violates the laws of the state ultimately travelled to. Although Walsh argues that the bribery here was only "committed" in New York, where the $10,000 was actually passed to Errichetti, New Jersey law indicates that the bribery was also "committed" in that state, since Errichetti had previously agreed in New Jersey to take the payment to influence his official actions in New Jersey. *See State v. Carminati,* 162 N.J.Super. 234, 392 A.2d 644, 651 (N.J.Super.Ct.Law Div.1978). Because Errichetti could have been prosecuted in New Jersey for the payment received in New York, *see id.,* the jury's finding that Walsh caused him to travel to New York with intent to violate New Jersey law was a sufficient basis for Walsh's count six conviction.

## III STATUTE OF LIMITATIONS

BWA and Walsh attack the count seven conspiracy conviction as barred by the federal five-year statute of limitations for noncapital offenses. With respect to count seven, Judge Pratt instructed the jury that they could convict only if one of the conspirators knowingly committed one of the overt acts charged in the indictment. The indictment originally listed ten overt acts, eight of which were submitted to the jury. The remaining two were not charged because of insufficient evidence. Of the eight acts considered by the jury, only two allegedly occurred within the limitations period. Appellants' argument is that since both of these overt acts were committed by Barbato, who was acquitted on the conspiracy charge, the government failed to prove an overt act by a conspirator within the requisite statutory period.

No request was made at trial for a statute of limitations instruction regarding the conspiracy charge, nor was an objection taken to the trial court's failure to give such an instruction to the jury. Citing

*United States v. Grammatikos,* 633 F.2d 1013 (2d Cir.1980), and *United States v. Cianchetti,* 315 F.2d 584 (2d Cir.1963), the government contends that appellants therefore waived their right to raise the limitations defense on appeal. *Grammatikos* and *Cianchetti,* however, involved only a waiver of the right to appeal from a trial court's failure to instruct the jury on the statute of limitations. *See Grammatikos,* 633 F.2d at 1022; *Cianchetti,* 315 F.2d at 589. Neither holds that failure to object at trial to the lack of a statutory limitations instruction waives the underlying issue of whether there was sufficient evidence of the overt acts occurring within the statutory limitation period. Nonetheless, we hold that appellants may not now assert their statute of limitations claim for the first time.

If the statute of limitations is an element of jurisdiction, it could of course be raised for the first time on appeal. However the running of the limitations period does not defeat jurisdiction. In *United States v. Doyle,* 348 F.2d 715, 718 (2d Cir.), *cert. denied,* 382 U.S. 843, 86 S.Ct. 89, 15 L.Ed.2d 84 (1965) and *United States v. Parrino,* 203 F.2d 284, 286–87 (2d Cir.1953), we held that a defendant cannot raise the issue of limitations after pleading guilty to the offense in question. In so holding the Court reasoned that a guilty plea ordinarily waives all non-jurisdictional defects in the proceedings. *See Doyle,* 348 F.2d at 718–19; *Parrino,* 203 F.2d at 286–87; *see also United States v. Selby,* 476 F.2d 965, 966 (2d Cir.1973). By refusing to consider the limitations issue our Court implicitly held that the statute of limitations does not go to jurisdiction. *See also United States v. Wild,* 551 F.2d 418, 422 (D.C.Cir.1977); Case Comment, *Waiver of the Statute of Limitations in Criminal Prosecutions:* United States v. Wild, 90 Harv.L.Rev. 1550, 1553–54 (1977). Although *Doyle* and *Parrino* involved guilty pleas rather than waivers by omission, as here, this distinction does not alter our conclusion that the statute of limitations is non-jurisdictional.

It appears that the statute of limitations is an affirmative defense, *see Biddinger v.*

*Commissioner of Police,* 245 U.S. 128, 135, 38 S.Ct. 41, 43, 62 L.Ed. 193 (1917), not cognizable on appeal unless properly raised below. *See United States v. Akmakjian,* 647 F.2d 12, 14 (9th Cir.1981); R. Cipes, 8 *Moore's Federal Practice* ¶ 12.03[1], at 12–17 to 12–18 (2d ed. 1981); 1 C. Wright, *Federal Practice and Procedure* § 193, at 705–08 (2d ed. 1982). BWA and Walsh did not raise the defense in a pretrial motion to dismiss, although such a mechanism was available. *See* Fed.R.Crim.P. 12(a); 1 C. Wright, *Federal Practice and Procedure* § 193, at 707 (2d ed. 1982). Moreover, while appellants could have asserted the defense for the first time at trial after pleading not guilty, they did not.

■■■■ In sum, appellants failed to raise the defense at the trial level, unless it can be said that a plea of not guilty, standing alone, put the statute of limitations into issue. We do not believe that it did.[5] While a "not guilty" plea puts into issue every fact essential to constitute the offense, i.e., the elements of the offense, *see United States v. England,* 347 F.2d 425, 431 (7th Cir.1965), the statute of limitations is not an element of the crime charged.[6] Instead the statute simply limits the government's power to prosecute the case. A plea of not guilty does not in and of itself raise other affirmative defenses which restrict the power to prosecute. *See, e.g., United States v. Friedland,* 391 F.2d 378, 381 (2d Cir.1968), (collateral estoppel defense not raised at trial even though defendant pleaded not guilty); *cert. denied,* 404 U.S. 867, 92 S.Ct. 143, 30 L.Ed.2d 111 (1971); *Barker v. Ohio,* 328 F.2d 582, 584 (6th Cir.1964) (double jeopardy defense not raised at trial even though defendant pleaded not guilty). Thus, we see no reason to hold that the plea of not guilty, by itself, raised the affirmative statute of limitations defense here. Appellants therefore have waived their statute of limitations objection to the count seven convictions.

## IV *BLOCKBURGER* ARGUMENT

■■■■ Citing *Blockburger v. United States,* 284 U.S. 299, 52 S.Ct. 180, 76 L.Ed. 306 (1932), Walsh next claims that his sentences on counts three through six must be vacated because his cumulative fines constitute impermissible multiple punishment for the same criminal acts upon which his RICO conviction was based. The teaching of the Supreme Court's recent decision in *Albernaz v. United States,* 450 U.S. 333, 101 S.Ct. 1137, 67 L.Ed.2d 275 (1981), is that where Congress has made sufficiently clear its intention to impose multiple punishments for the same act, imposition of such punishment is constitutional. *United States v. Alexandro,* 675 F.2d 34, 42 (2d Cir.1982). It is well settled that Congress sought to permit cumulative sentences for a RICO conviction and the predicate offenses upon which the RICO violation is premised. *See United States v. Hartley,* 678 F.2d 961, 992 (11th Cir.1982); *United States v. Boylan,* 620 F.2d 359, 361 (2d Cir.), *cert. denied,* 449 U.S. 833, 101 S.Ct. 103, 66 L.Ed.2d 38 (1980); *United States v. Rone,* 598 F.2d 564, 571 (9th Cir. 1979). Given this congressional purpose, the sentence was properly imposed.

---

5. In *Parrino,* Judge Learned Hand stated, in dictum, that the statute of limitations "must be raised by the plea of not guilty." 203 F.2d at 287. Viewing the context in which he made the statement, we do not read it to stand for the proposition that a "not guilty" plea, without more, automatically puts the statute of limitations into issue. Our reading of *Parrino* leads us to believe that Judge Hand was merely distinguishing between the situation where a defendant pleads guilty and, therefore, is barred from later raising the statute of limitations, and the situation where a defendant pleads not guilty and is able thereafter to raise the limitations defense.

6. Failure to instruct on an element of the offense charged is a fundamental error that may be raised on appeal regardless of whether or not an objection was entered at trial. *See Screws v. United States,* 325 U.S. 91, 107, 65 S.Ct. 1031, 1038, 89 L.Ed. 1495 (1945). Since this Court has repeatedly held that a trial court's failure to charge on the statute of limitations is not cognizable on appeal unless objected to below, *see Grammatikos,* 633 F.2d at 1022; *Cianchetti,* 315 F.2d at 589, our decisions impliedly support the proposition that the statute of limitations is not an element of the offense charged.

## V FORFEITURE

Walsh contends that the special RICO forfeiture verdict against him must be vacated for two reasons. First, he asserts that the only remaining assets of BWA are some lingering accounts receivable and five percent of all future billings arising out of consulting contracts assigned to third parties, and that this percentage of future fees constitute income not forfeitable under RICO. Second, Walsh argues that the 55 percent forfeiture verdict was not supported by sufficient evidence since no proof was presented to the jury as to what extent BWA's assets were tainted by criminal conduct.

■ The forfeiture provision of RICO states that the RICO violator will forfeit "(1) any interest he has acquired or maintained in violation of § 1962, and (2) *any* interest in . . . any enterprise which he has . . . conducted . . . in violation of § 1962." 18 U.S.C. § 1963(a) (1976). With respect to Walsh's first contention, it may well be that income received by a RICO defendant from an enterprise conducted in violation of RICO is not an "interest" in the enterprise forfeitable under § 1963(a). *See United States v. Marubeni America Corp.*, 611 F.2d 763, 766–70 (9th Cir.1980). *But see United States v. Martino*, 681 F.2d 952, 961 (5th Cir.1982) (en banc), *cert. granted sub nom. Russello v. United States*, —— U.S. ——, 103 S.Ct. 721, 74 L.Ed.2d 948 (1983). However, this contention is not relevant here. What was directed to be forfeited was 55 percent of Walsh's nearly 100 percent interest in BWA. The extent to which BWA's assets were forfeitable is not before us.

■ His second contention is also without merit. The RICO forfeiture provision was designed to impose forfeiture upon a defendant's entire interest in the RICO enterprise, *see* H.R.Rep. No. 91–1549, 91st Cong., 2d Sess. 56–57 (1970), *reprinted in* 1970 U.S.Code Cong. & Ad.News 4007, 4033, so as to sever his connection with it. *See United States v. Rubin*, 559 F.2d 975, 991–92 (5th Cir.1977), *cert. denied*, 444 U.S. 864, 100 S.Ct. 133, 62 L.Ed.2d 87 (1979). Determining the degree of the enterprise's crimi-

nal taint is not contemplated by the statute. Congress enacted RICO as a more potent weapon than fines or prison terms in an attempt to eradicate organized crime's economic base. *See United States v. Rubin*, 559 F.2d at 991. Differentiating between those parts of a RICO enterprise engaged in racketeering activity and those that are not is not a requirement under the statute for determining whether a defendant's interest is subject to forfeiture. If such were the case Congress' purpose would be completely thwarted simply by a transfer of assets from one part of the enterprise engaged in illegal racketeering to another part not so engaged. *See United States v. Huber*, 603 F.2d 387, 394 (2d Cir.1979), *cert. denied*, 445 U.S. 927, 100 S.Ct. 1312, 63 L.Ed.2d 758 (1980). From this analysis we conclude that for purposes of the statute, the assets of a RICO enterprise are indivisible.

■ The only apparent limitations upon this complete forfeiture are the Eighth Amendment's prohibition against cruel and unusual punishment, *see United States v. Huber*, 603 F.2d at 397, the discretionary power of the Attorney General to ameliorate overly harsh forfeitures through remission, and the power of the court to impose proper terms and conditions on the Attorney General's seizure. *See id;* 18 U.S.C. § 1963(c) (1976). While the defendant's interest in a RICO enterprise is indivisible for forfeiture purposes, *Huber* raises the possibility that an enterprise implicated in RICO activity may also be substantially engaged in legitimate business. As *Huber* notes the Eighth Amendment in such a situation may well prohibit forfeiture of the entire interest in the enterprise. The burden of moving to ameliorate the harshness of a forfeiture verdict in that case, however, rests on the defendant. The government was under no obligation to present evidence of the degree to which BWA's assets were "tainted" by illegal activities. Any error made in allowing the jury to consider the degree to which BWA's assets were so tainted without the defendant having raised the Eighth Amendment issue, inured to Walsh's benefit.

858

## VI OTHER ARGUMENTS

 Appellants' remaining objections merit only cursory discussion. First, Walsh claims that the court improperly instructed the jury on the applicable New Jersey bribery statutes, because it failed to charge specifically as an essential element of each offense "intent to corrupt official action." At trial, however, he neither objected to the charge as given nor proposed alternative instructions. Absent a finding of plain error any impropriety with respect to the charge as given cannot constitute grounds for reversal. *See United States v. D'Auria,* 672 F.2d 1085 (2d Cir.1982). Upon review we conclude that the charges adequately set forth the elements of the offense of bribery under New Jersey law. Second, Walsh argues that the court erred by charging the jury that making gifts to public officials in violation of N.J.Stat.Ann. 2C: 27–6 was an "unlawful activity" (bribery) sufficient to support the count six Travel Act charge. Although he correctly points out that 2C: 27–6 is technically a "gratuity" or "corrupt solicitation" statute, not a "bribery" statute, 2C: 27–6 proscribes conduct which fits within the broad generic description of bribery. As such, it was properly charged to the jury as a Travel Act predicate of bribery. *See United States v. Forsythe,* 560 F.2d 1127, 1137–38 (3d Cir.1977); *cf. United States v. Nardello,* 393 U.S. 286, 295–96, 89 S.Ct. 534, 539, 21 L.Ed.2d 487 (1969) (in Travel Act prosecution involving predicate unlawful activity of extortion, term "extortion" includes all acts within its generic description).

 Finally, appellants assert that an oral proffer of evidence by the government to the court *in camera* and *ex parte* during the trial necessitates reversal. An *ex parte* proceeding should not be conducted except in extraordinary circumstances. *See United States v. Persico,* 349 F.2d 6, 13 (2d Cir.1965). The fact that such a meeting occurs, however, does not require reversal if it does not affect the fairness of the trial. *Id.* Here a verbatim transcript of the *ex parte* proceeding was made, sealed, and forwarded to the Court as part of the record.

Having read it we are satisfied that the meeting was limited to a request by the prosecution for a ruling on whether certain evidence regarding the credibility of a potential prosecution witness would have to be disclosed as *Brady* material. After the trial court ruled that the evidence would have to be disclosed, the witness was not called. Under the circumstances, appellants' right to a fair trial was not prejudiced.

The judgment is affirmed.