**19-361-cr**
*United States of America v. Smilowitz*

# In the

# United States Court of Appeals

## For the Second Circuit

————

AUGUST TERM, 2019

ARGUED: FEBRUARY 10, 2020
DECIDED: SEPTEMBER 8, 2020

No. 19-361

UNITED STATES OF AMERICA,
*Appellee,*

*v.*

VOLVY SMILOWITZ, AKA ZEV SMILOWITZ,
*Defendant-Appellant,*

SHALOM LAMM, KENNETH NAKDIMEN,
*Defendants.*

————

Appeal from the United States District Court
for the Southern District of New York.
Vincent Briccetti, *Judge.*

————

Before: WALKER, PARKER, and CARNEY, *Circuit Judges.*

————

Volvy "Zev" Smilowitz pled guilty to (1) conspiring to submit false voter registrations and buying voter registrations in violation of 18 U.S.C. § 371 and 52 U.S.C. § 10307(c) and (2) conspiring to violate the Travel Act by paying bribes for voter registrations and votes, in violation of 18 U.S.C. §§ 371 and 1952. Specifically, Smilowitz bribed individuals to unlawfully vote in Bloomingburg, New York, and he and his co-defendants falsified voter registration records to make it appear as though these individuals lived in Bloomingburg for at least thirty days prior to their registration. On appeal, Smilowitz argues that the federal election statute, 52 U.S.C. § 10307(c), does not apply because the offense conduct was strictly tied to a local, not federal, election. He also argues that his conviction under the Travel Act was improper because buying voter registrations does not constitute bribery. We conclude that 52 U.S.C. § 10307(c) applied to Smilowitz's conduct because it exposed future federal elections to corruption. We also conclude that his payment to influence voter conduct fits within the generic definition of bribery and thus violated the Travel Act. Therefore, we AFFIRM the judgment.

————

AUDREY STRAUSS, Acting United States Attorney for the Southern District of New York, Attorney for United States of America, New York, NY (Kathryn Martin; Daniel B. Tehrani, New York, NY; Assistant United States Attorneys, New York, NY, *on the brief*), *for Plaintiff-Appellee*.

BARKET EPSTEIN KEARON ALDEA & LOTURCO, LLP (Donna Aldea, Alex Klein, *on the brief*), Garden City, NY, *for Defendant-Appellant*.

_____

JOHN M. WALKER, JR., *Circuit Judge*:

Volvy "Zev" Smilowitz pled guilty to (1) conspiring to submit false voter registrations and buying voter registrations in violation of 18 U.S.C. § 371 and 52 U.S.C. § 10307(c) and (2) conspiring to violate the Travel Act by paying bribes for voter registrations and votes, in violation of 18 U.S.C. §§ 371 and 1952. Specifically, Smilowitz bribed individuals to unlawfully vote in Bloomingburg, New York, and he and his co-defendants falsified voter registration records to make it appear as though these individuals lived in Bloomingburg for at least thirty days prior to their registration. On appeal, Smilowitz argues that the federal election statute, 52 U.S.C. § 10307(c), does not apply because the offense conduct was strictly tied to a local, not federal, election. He also argues that his conviction under the Travel Act was improper because buying voter registrations does not constitute bribery. We conclude that 52 U.S.C. § 10307(c) applied to Smilowitz's conduct because it exposed future federal elections to corruption. We also conclude that his payment to influence voter conduct fits within the generic definition of bribery and thus violated the Travel Act. Therefore, we AFFIRM the judgment.

**BACKGROUND**

This conviction stemmed from Smilowitz's involvement in a criminal voting scheme to further a real estate development project in the village of Bloomingburg, New York. With a small population of about 420 people, Bloomingburg is managed only by a mayor and two trustees. Smilowitz was a business associate of Shalom Lamm and Kenneth Nakdimen, two real estate developers. In 2006, these developers planned a development in the village that was expected to house thousands of families from the Hasidic Jewish community. Smilowitz and his father entered into a non-binding letter of intent to buy Chestnut Ridge, the first part of the development, for more than $29 million. In a confidential "Executive Summary," circulated to potential investors, Lamm and Nakdimen stated that the project would provide an excellent location for an Hasidic community and that, because of Bloomingburg's small population, this religious community would be able to control local government decisions. Wary of local objections to the project, Lamm and Nakdimen kept it secret and repeatedly misrepresented the scope of the development while gaining the requisite real estate approvals.

By late 2013, following years of construction, Bloomingburg's residents learned of the scheme. The village halted Chestnut Ridge's construction, which left it uninhabitable. After local elected officials voted against measures that Lamm, Nakdimen, and Smilowitz

needed to complete the Chestnut Ridge project, the three men sought to replace two of the elected officers with their chosen candidates. Specifically, they wanted to install Mark Berensten, a Chestnut Ridge supporter, as mayor and Harold Baird as a trustee. Because Baird did not live in the village, the conspirators helped him find a residence in the Village that he could falsely register as his.

With the majority of Bloomingburg residents opposed to the development, Lamm and Nakdimen sought to increase their favorable voting base by encouraging individuals to move into rental properties the defendants purchased in Bloomingburg. To that end, defendants sought out members of the Hasidic community living elsewhere whom they could register to vote. Smilowitz, acting as a liaison, reached out to residents in Kiryas Joel, New York, and the Williamsburg section of Brooklyn, New York, and offered them cash payments and rent subsidies in return for their agreement to move to and register to vote in Bloomingburg. By the residency registration deadline of February 18, 2014, a month before the March 18 election, however, only a few of these individuals had actually moved to Bloomingburg and most of the previously purchased rental properties remained vacant.

Undeterred, Lamm, Nakdimen, Smilowitz and others working at their public relations firm, Beckerman PR, fraudulently registered approximately 142 new voters. Each registrant had to submit a

signed, sworn New York State voter registration form to the Sullivan County Board of Elections (BOE).  Smilowitz and his co-defendants falsified registration forms by listing registrants' addresses as the Bloomingburg properties owned by Lamm and Nakdimen and by stating that these individuals had been living in Bloomingburg for at least thirty days prior to registration, as required by New York law. At Smilowitz's insistence, these ineligible voters signed backdated rental applications.  The defendants also had Beckerman PR employees go to the rental residences and leave personal items, such as toiletries, to make the homes appear occupied.

Prior to the March 18, 2014 election, after Bloomingburg certain residents sued in state court to invalidate the new voter registrations on the basis of non-residency, a Sullivan County Supreme Court justice ordered the challenged registrants to vote by affidavit ballot, attesting to their residency.  On March 13, 2014, federal agents executed search warrants on various business offices and sham residences of Lamm and Nakdimen.

On Election Day, Lamm, Nakdimen, and Smilowitz arranged transportation to Bloomingburg for the registrants who lived elsewhere.  A total of 265 votes were cast in the election.  After 157 votes were challenged and invalidated by the BOE in connection with defendants' scheme, incumbent mayor Frank Gerardi, who opposed the development, won reelection.

On December 12, 2016, a grand jury charged Lamm, Nakdimen, and Smilowitz with one count of conspiring to submit false voter registrations and buy voter registrations in violation of 18 U.S.C. § 371 and 52 U.S.C. § 10307(c), and conspiring to violate the Travel Act by paying bribes for voter registrations and votes, in violation of 18 U.S.C. §§ 371 and 1952.

On November 10, 2017, Smilowitz moved to dismiss the Indictment on three grounds. He argued first, that 52 U.S.C. § 10307(c), the federal election statute, did not apply to him because the alleged scheme related solely to a local election; second, that the Indictment should be dismissed because it was "vague" as applied to him; and finally, that the Travel Act object of the conspiracy was invalid because purchasing voter registrations and votes does not constitute bribery under the applicable New York statute. The District Court for the Southern District of New York (Briccetti, *J.*) rejected these arguments and denied the motion.

On June 15, 2018, Smilowitz pled guilty pursuant to a written plea agreement to Count One of the Superseding Indictment containing the foregoing single conspiracy count. On January 24, 2019, the district court sentenced Smilowitz to three months' imprisonment, followed by one year of supervised release, together with 200 hours of community service.

**DISCUSSION**

On appeal, Smilowitz presses the arguments made before the district court, except for the vagueness claim.[1]  We review "questions of statutory interpretation *de novo*."[2]  We also "review a district court's denial of a motion to dismiss an indictment *de novo*."[3]

### I.      The Federal Election Statute

Smilowitz first contends that his conviction under 52 U.S.C. § 10307(c), which pertains to federal elections, must be vacated because his admitted conduct related only to a local election with no federal candidate on the ballot.  In connection with this argument, it is critical to note that New York's election system is unitary, whereby registration entitles an individual to vote in all local, state and federal government elections.

Congress enacted § 10307 under its constitutional power to shield federal elections from fraud or corruption. That power is found in Article I, Section 4 of the Constitution which specifies that: "The

---

[1] The government contends that Smilowitz's claims are waived by his unconditional guilty plea. Smilowitz argues that *Class v. United States*, 138 S. Ct. 798 (2018), preserves his challenge to the constitutionality of his conviction. *Class* held that a guilty plea, by itself, does not bar a defendant from challenging the constitutionality of the statute of conviction on appeal. *Id*. at 803. Because we reject Smilowitz's arguments on the merits, we do not address the contours of appellate review following a guilty plea post-*Class*.

[2] *United States v. Epskamp*, 832 F.3d 154, 160 (2d Cir. 2016) (quoting *Roach v. Morse*, 440 F.3d 53, 56 (2d Cir. 2006)).

[3] *United States v. Canori*, 737 F.3d 181, 182 (2d Cir. 2013) (citations omitted).

Times, Places and Manner of holding Elections for Senators and Representatives, shall be prescribed in each State by the Legislature thereof; but the Congress may at any time by Law make or alter such Regulations, except as to the Places of chusing Senators."[4] The Supreme Court has recognized that if Congress does not "have the power to protect the elections on which its existence depends . . . . it is left helpless before the two great natural and historical enemies of all republics, open violence and insidious corruption."[5]  This authority is augmented by the Necessary and Proper Clause, which empowers Congress: "To make all Laws which shall be necessary and proper for carrying into Execution the foregoing Powers, and all other Powers vested by this Constitution in the Government of the United States, or in any Department or Officer thereof."[6]

Notwithstanding this express constitutional authority to regulate federal elections, case law has made clear that Congress must not encroach on the states' authority to regulate their own electoral processes.[7] Because the "Constitution grants to the States a broad

---

[4] U.S. Const. art. I, § 4, cl. 1.

[5] *The Ku Klux Cases*, 110 U.S. 651, 658 (1884).

[6] U.S. Const. art. I, § 8, cl. 18.

[7] *See, e.g.*, *Burdick v. Takushi*, 504 U.S. 428, 433 (1992) ("recogniz[ing] that States retain the power to regulate their own elections"); *Tashjian v. Republican Party of Connecticut*, 479 U.S. 208, 217 (1986) ("The Constitution grants to the States

power" to regulate their election procedures, long-standing federalism principles limit congressional infringement on state elections.[8]

Title 52, section 10307(c) of the United States Code, under which Smilowitz was convicted, regulates only federal elections. It states in relevant part:

> Whoever knowingly or willfully gives false information . . . for the purpose of establishing his eligibility to register or vote, or conspires with another individual for the purpose of encouraging his false registration to vote or illegal voting, or pays or offers to pay or accepts payment either for registration to vote or for voting shall be fined not more than $10,000 or imprisoned not more than five years, or both: *Provided, however*, That this provision shall be applicable only to general, special, or primary elections held solely or in part for the purpose of selecting or electing any candidate for the office of President, Vice President, presidential elector, Member of the United States Senate, Member of the United States House of Representatives . . . .

Smilowitz contends that the plain text of the "provided, however" clause limits the reach of the statute to only those elections

---

a broad power to prescribe the 'Times, Places and Manner of holding Elections for Senators and Representatives.'"); *Boyd v. Nebraska*, 143 U.S. 135, 161 (1892) ("Each state has the power to prescribe the qualifications of its officers, and the manner in which they shall be chosen . . . ."); *United States v. Bowman*, 636 F.2d 1003, 1008 (5th Cir. 1981) (noting that Congress added qualifying language to the initial federal election statue because "it was felt that Congress had no constitutional authority to enact legislation to prevent corruption in all elections, both state and federal").

[8] *Tashjian*, 479 U.S. at 217.

that include a federal candidate, and that because no federal candidate was on the ballot in the March 18, 2014 Bloomingburg election in this case, § 10307(c) has no application here. He further argues that allowing the statute to reach state-only elections would violate the principles of federalism that limit Congress's authority over state elections.

The government responds with two arguments. First, the government counters Smilowitz's textual argument with a textual argument of its own: the "provided, however" clause is expressly limited to actual "elections," and because voter registrations are not elections and are not tied to any particular election, the "provided, however" limitation does not limit the government's power to regulate voter registrations regardless of whether they pertain to state or federal elections or a combination of the two. Therefore, the government maintains, the fact that only local candidates were on the ballot to which the registrations would immediately apply does not matter because the statute reaches Smilowitz's admitted tampering with voter registration in a state-only election.

We disagree with the government's textual argument. First, the plain text of § 10307 before the "provided, however" clause reaches both elections and registrations, and the text of the "provided, however" clause itself is most naturally read to modify all of that which precedes the clause. The "provided, however" clause refers to

the prohibitory command of the entire section preceding it when it states that "this *provision* shall be applicable" to the election of the specified federal candidates. The entire provision offers no indication that the "provided, however" clause is carving out "false registration to vote" from the language it modified.

The government's strained textual reading would permit federal regulation of voter registration that applies only to state and local elections, even though federal courts have consistently held that, because core principles of federalism limit federal control over state matters, federal courts lack jurisdiction over a "pure" state or local election.[9] We reject the government's argument because it cannot be reconciled with the text and it offends federalism principles and related caselaw.[10]

The government's second argument fares much better, however. The government contends that, because New York's

---

[9] *See, e.g.*, *United States v. Slone*, 411 F.3d 643, 649 (6th Cir. 2005); *Bowman*, 636 F.2d at 1011 (concluding that "Congress may regulate 'pure' federal elections, but not 'pure' state or local elections"); *see also United States v. Cole*, 41 F.3d 303, 306 (7th Cir. 1994) (holding that federal courts have jurisdiction in a mixed federal/state election); *Schuler v. Bd. of Educ. of Cent. Islip Union Free Sch. Dist.*, No. 96-CV-4702 (JG), 2000 WL 134346, at *12 n.18 (E.D.N.Y. Feb. 1, 2000) (noting that *Bowman* stands for the proposition that Congress may not regulate "pure" state or local elections).

[10] *See Burdick*, 504 U.S. at 433 (interpreting Art. I, § 4, cl.1 of the Constitution and noting that "the Court . . . has recognized that States retain the power to regulate their own elections").

registration process is unitary, Smilowitz's fraudulent conduct has the potential to affect future federal elections.

The registration process implicated here was not confined to a "pure" state or local election of the sort that would be beyond the power of Congress to regulate. New York's unitary registration process *permanently* qualifies a registrant to cast ballots in any local, state, or federal election. Thus, Smilowitz's conduct is within the statute's purview. Because § 10307(c) reaches voter registrations that pertain to the federal elections specified in the "provided, however" clause, and because the registrations here cover future federal elections, the statute applies to the fraudulent conduct in this case.

Our ruling is in keeping with the purpose of the Voting Rights Act of 1965: to protect the integrity of the federal vote through new enforcement tools.[11] The fact that no federal candidate was on the Bloomingburg ballot on March 18, 2014 is of no moment. Because of New York's unitary registration system, Smilowitz's actions exposed future federal elections to corruption. To hold otherwise would arbitrarily limit voter registration challenges because, in the context of a unitary registration, it is "impossible to isolate a threat to the

---

[11] *See Bowman*, 636 F.2d at 1008 (noting that the "legislative history of the Act reveals a Congressional desire to protect the integrity of a person's right to vote by protecting the integrity of that vote"); *see also United States v. Cianciulli*, 482 F. Supp. 585, 617 (E.D. Pa. 1979) (discussing the legislative history and Congress's intent to protect the federal electoral process from corruption).

integrity of the state electoral process from a threat to the integrity of the federal contest."[12]

Smilowitz argues that recognizing federal jurisdiction because of New York's unitary registration system violates principles of federalism since "unitary registration prevails in practically every state in America." While unitary registration is prevalent, applying the prohibition to unitary registrations raises no federalism concerns because the crime affects voter registrations that permit federal voting. Moreover, any lingering federalism concerns could be mitigated by any state's modifying its local election laws to have a separate registration process for purely state elections.

Our reasoning aligns with that of several of our sister circuits.[13] The Seventh Circuit's decision in *United States v. Lewin* is instructive.[14] There, the appellants were convicted of conspiracy to pay and offer to pay persons for registering to vote in violation of 42 U.S.C. § 1973i(c) (now codified at 52 U.S.C. § 10307(c)).[15] The Seventh Circuit rejected the same local election argument that Smilowitz makes here,

---

[12] *Bowman*, 636 F.2d at 1012.

[13] *See, e.g., id.*; *United States v. McCranie*, 169 F.3d 723, 727 (11th Cir. 1999) (citing *Bowman*, 636 F.2d at 1012); *United States v. Mason*, 673 F.2d 737, 739 (4th Cir. 1982); *United States v. Lewin*, 467 F.2d 1132, 1136 (7th Cir. 1972).

[14] 467 F.2d 1132.

[15] *Id.* at 1134.

reasoning that because Illinois had "permanent registration" for "all elections in Illinois," there was "no merit in the contention" that the statute did not apply.[16]

The Fifth Circuit in *Bowman* employed similar reasoning in addressing 42 U.S.C. § 1973i(c)'s applicability to certain registration conduct. Specifically, the Fifth Circuit referred to *Lewin* for the proposition that because "permanent voter registration in Illinois carried with it the privilege of voting in both federal and non-federal elections," and because the "act of registering, whether or not it occurs in the same year as a federal election, creates an eligibility to vote in a federal election," the fraudulent conduct would have "an equal impact" upon the federal and non-federal elections.[17]

Likewise, we hold here that the prohibitions in 52 U.S.C. § 10307(c) apply to any voter registration practices that expose federal elections – present or future – to corruption, regardless of whether

---

[16] *Id*. at 1136.

[17] *Id*.  The Fifth Circuit also cited *United States v. Cianciulli* for the proposition that 1973i(c) includes "false voter registrations occurring in both federal and non-federal election years because the act of registering, whether or not it occurs in the same year as a federal election, creates an eligibility to vote in a federal election" and thus, corrupt practices "would have equal impact upon the federal and the non-federal election." *Bowman*, 636 F.2d at 1011 (citing *Cianciulli*, 482 F. Supp. 585, 617-18 (E.D. Pa. 1979)).  Here, the district court relied on *Cianciulli* and *United States v. Lewis*, 514 F. Supp. 169 (M.D. Pa. 1981).  In both those cases, the courts found that, because Pennsylvania had a unitary registration system, Section 1973i(c) outlawed all fraudulent registrations.

any federal candidate is on the immediate ballot. Because Smilowitz's conduct, due to New York's unitary registration format, had "the *potential* to affect the 'integrity and purity' of [a federal] election,"[18] we conclude that § 10307(c) is applicable.

## II.   The Travel Act

Smilowitz next contends that the Travel Act component of his conspiracy conviction should be reversed because his conduct did not satisfy the requisite predicate offense of "bribery." The Travel Act criminalizes, among other things, interstate travel and use of the mail in connection with conduct related to "unlawful activity." In particular, 18 U.S.C. § 1952(a), in pertinent part, prohibits individuals from travelling interstate and using the mail to "promote, manage, establish, carry on, or facilitate the promotion, management, establishment or carrying on, of any unlawful activity," or who attempt to do the same.[19]

Section 1952(b) defines "unlawful activity," in relevant part, as "extortion, bribery, or arson in violation of the laws of the State in

[18] *McCranie*, 169 F.3d at 727 (citing *Bowman*, 636 F.2d at 1012); *see also Mason*, 673 F.2d at 739 (holding that Congress "clearly includes the power to regulate conduct which, although directed at non-federal elections, also has an impact on the federal races").

[19] 18 U.S.C. § 1952(a).

which committed or of the United States . . . ."[20] Here we are concerned with the meaning of the term "bribery" in that section.

The question before us is whether the New York state offense to which Smilowitz pled guilty, New York Election Law § 17-142, amounted to "bribery" within the meaning of § 1952(b). Under § 17-142, a person is guilty of a felony if he:

> Pays, lends or contributes or promises to pay, lend or contribute any money or other valuable consideration to or for any voter, or to or for any other person, to induce such voter or other person to vote or refrain from voting at any election, or to induce any voter or other person to vote or refrain from voting at such election for any particular person or persons, or for or against any particular proposition submitted to voters, or to induce such voter to come to the polls or remain away from the polls . . . .

Smilowitz argues that because § 17-142 does not punish bribery as defined by the New York state bribery statutes,[21] which requires the payee to be a "public servant,"[22] his violation of § 17-142 cannot

---

[20] *Id.* § 1952(b).

[21] The crimes of bribery under New York law—New York Penal Law §§ 200.00 (third degree), 200.03 (second degree), 200.04 (first degree)—each require that the "benefit" the guilty party "confers, or offers or agrees to confer" be directed to "a public servant." Under New York Election Law § 17-142, however, the consideration that must be paid or promised by the guilty party may be directed to "any . . . person."

[22] N.Y. Penal Law §§ 200.00, 200.03, 200.04.

serve as the Travel Act predicate "crime of bribery." However, precedent forecloses this argument.

First, the Supreme Court held forty years ago in *Perrin v. United States* that in enacting the Travel Act, Congress intended "the generic definition of bribery, rather than a narrow common-law definition limited to public officials, was intended by Congress."[23] In describing the activities that fit within the generic definition, the Supreme Court noted that even at the time of Blackstone, "the crime of bribery had been expanded to include the corruption of any public official *and the bribery of voters* and witnesses as well."[24]  The Court pointed to the legislative history of § 1952 to indicate that Congress "used 'bribery' [in the Travel Act] to include payments to private individuals to influence their actions."[25]  A decade earlier, in *United States v. Nardello*, the Court held that in a Travel Act prosecution, the predicate unlawful activity of extortion includes all acts within its generic description.[26]  *Nardello* made clear that "the inquiry is not the manner

---

[23] 444 U.S. 37, 49 (1979).

[24] *Id*. at 43 (emphasis added).  The Model Penal Code also defines "bribery" to include conferring "any pecuniary benefit as consideration for the recipient's decision, opinion, recommendation, *vote* or other exercise of discretion as a public servant, party official, or *voter*.  Model Penal Code § 240.1(1) (emphasis added).

[25] *Id*. at 46.

[26] 393 U.S. 286, 295 (1969).

in which States classify their criminal prohibitions but whether the particular State involved prohibits the extortionate activity charged."[27] The same reasoning applies here. It is undisputed based on the text of § 17-142 that New York prohibited Smilowitz from paying voters. His conduct thus is within the federal definition of "bribery" under § 1952.

Second Circuit case law also supports our conclusion. We have held that the generic description of bribery applies to Travel Act convictions. In *United States v. Walsh*, the defendants challenged their Travel Act conviction on the basis that the applicable New Jersey bribery statute failed to specifically charge an "intent to corrupt official action."[28] We held that even though the applicable state statute was "technically a 'gratuity' or 'corrupt solicitation' statute, not a 'bribery' statute, [it] proscribe[d] conduct which fits within the broad generic description of bribery" and thus "was properly charged to the jury as a Travel Act predicate of bribery."[29] Because Travel Act bribery is construed broadly, the lack of a precise fit between § 17-142 and the New York bribery statute does not matter. We therefore agree

---

[27] *Id*.

[28] 700 F.2d 846, 858 (2d Cir. 1983).

[29] *Id*. (citing *United States v. Forsythe*, 560 F.2d 1127, 1137-38 (3d Cir. 1977)); *Nardello*, 393 U.S. at 295-96).

with the district court that Smilowitz's admitted payment to voters suffices as a Travel Act predicate.

## CONCLUSION

For the reasons stated above, we AFFIRM the judgment of the district court.